OFFICE & PROFESSIONAL EMPLOYEES
INTERNATIONAL UNION, LOCAL 2
(AFL-CIO) ET AL. *v.* MASS TRANSIT
ADMINISTRATION

[No. 133, September Term, 1981.]

*Decided December 23, 1982.*

The cause was argued before MURPHY, C. J., and SMITH, ELDRIDGE, COLE, DAVIDSON, RODOWSKY and COUCH, JJ.

*Joseph E. Finley,* with whom were *Melvin A. Steinberg* and *Steinberg, Lichter, Coleman & Rogers* on the brief, for appellants.

*Ira L. Oring* and *Joseph S. Kaufman* for appellee.

ELDRIDGE, J., delivered the opinion of the Court.

This declaratory judgment action concerns the authority of the Mass Transit Administration to enter into a collective bargaining agreement with the respondent Union covering the wages, hours, pension rights, etc. of a particular group of the Administration's employees.

The Mass Transit Administration (MTA) was created by Ch. 160 of the Acts of 1969, as an agency of the State of Maryland, to develop "improved and expanded transit facilities, consisting of rapid transit and bus service operating as a unified and coordinated regional transit system" in Baltimore City, Baltimore County and Anne Arundel County. Ch. 160 of the Acts of 1969, § 2, "Declaration of legislative policy"; Maryland Code (1977), § 7-102 of the Transportation Article. The organization, powers, duties and responsibilities of the MTA remain essentially as set forth in the 1969 statute.[1] Included among those statutory powers is the right of the MTA either to

---

1. Under the 1969 statute, the name of the agency was the "Metropolitan Transit Authority." By Ch. 526 of the Acts of 1970, the name was changed to the "Public Transit Administration," and the agency was placed in the newly created Department of Transportation. Ch. 253 of the Acts of 1971 changed the agency's name to the "Mass Transit Administration."

The provisions of Ch. 160 of the Acts of 1969 had been codified as Maryland Code (1957, 1968 Repl. Vol., 1969 Cum. Supp.), Art. 64B. In 1977, the provisions were re-codified as Title 7 of the Transportation Article.

construct new transit facilities or to acquire existing transit facilities. Code (1977), §§ 7-208 (a) (1), 7-301 (b), 7-305 and 7-401 (b) of the Transportation Article. Also included among the MTA's powers and duties are the following (§§ 7-601 and 7-602 (b) of the Transportation Article):

"§ 7-601. Labor contracts.

The Administration may deal with and make written contracts as to wages, salaries, hours, working conditions, and pension and retirement provisions with the accredited representatives of the employees who form part of any operating company that the Administration acquires, including the representative of any labor organization authorized to act for those employees.

"§ 7-602. Arbitration in labor disputes.

\* \* \*

"(b) *Unresolved labor dispute to be submitted to arbitration board.* — If, in a labor dispute between the Administration and any employees described in § 7-601 of this subtitle, collective bargaining does not result in agreement, the Administration shall submit the dispute to an arbitration board."

\* \* \*

In April 1970, the MTA acquired the assets of a privately owned bus company, the Baltimore Transit Company (BTC), and began operating bus service in the Baltimore metropolitan area. At the time of this acquisition, the respondent Office and Professional Employees International Union Local 2 (hereafter referred to as "the Union") was the accredited collective bargaining representative of certain employees of the BTC who performed secretarial and clerical tasks for the bus operations. The MTA assumed the collective bargaining agreement between the Union and the BTC as required by law.[2] Since that time, the MTA and the

---

2. Section 7-606 of the Transportation Article states:
"Obligations of Administration on acquisition of transit facilities.

Union have reached several new collective bargaining agreements covering former employees of the BTC.

Several years after its acquisition of the BTC, the MTA began a rapid rail transit development program (subway) which required the hiring of several new employees. This group of new employees included a support staff of secretaries and clerical workers needed for the planning, engineering and construction of the metropolitan Baltimore subway system. Also, the creation of the Department of Transportation and the placement of the MTA within that Department, by Ch. 526 of the Acts of 1970, effective July 1, 1971, resulted in some reorganization causing the MTA to employ additional secretaries and clerical employees. The additional secretaries and clerical employees who were hired because of the subway operation and the creation of the Department of Transportation, and who had not been employees of the BTC, are approximately thirty-five in number. As found by the court below, the jobs of these additional secretaries and clerical employees "are often very similar to those of employees represented by the Union." The court went on to point out, however, that these employees are in grades comparable and similar to those established by the State Department of Personnel for most other state employees, that they are required to be members of the state pension system, and that they are treated as regular state employees for budgetary and pension purposes. These thirty-five additional secretarial and clerical employees (hereafter collectively referred to as the "clerical employees") are the subject of the dispute in this case.

Some time prior to 1978, many of these additional clerical employees expressed an interest in being covered by the

If the Administration acquires existing transit facilities from a public or privately owned public utility, whether by condemnation or otherwise, the Administration shall assume all existing labor contracts and pension obligations."

Section 7-607 (c) of the same Article provides:

"*Assumption of collective bargaining agreement.* — The Administration shall assume any collective bargaining agreement between an acquired transportation system and the authorized representative of its employees."

Union's contract with the MTA, and they signed cards authorizing the Union to represent them. During the 1978 collective bargaining negotiations between the MTA and the Union, the Union demanded that the additional clerical employees be recognized as part of the bargaining unit for which the Union was the accredited representative. The demand was later withdrawn, and further attempts by the Union in 1979 and 1980 to represent these clerical employees also failed. During contract negotiations in March 1981, the Union again requested that the additional clerical employees be covered in the collective bargaining agreement by adding job classifications to the agreement. When the MTA refused to bargain over this request, contract negotiations ceased, and the Union demanded arbitration of the representation issue.[3]

The MTA then commenced the present action by filing a bill of complaint in the Circuit Court of Baltimore City. The MTA sought a declaratory judgment that it was not legally authorized to recognize the Union as the collective bargaining representative of the thirty-five clerical employees and that arbitration of the representation issue was "illegal under Maryland law." The Union sought dismissal of the MTA's bill; it also filed a counterclaim for an order directing the MTA to arbitrate the issue of representation.

After a hearing, the Circuit Court filed a declaratory judgment and, following the Union's motion for reconsideration, a supplemental declaratory judgment. The court declared that the MTA has no "authority to bind itself to collectively bargain in matters of employee compensation in the absence of enabling legislation." The court further declared that the authorization to enter collective

---

3. The collective bargaining agreement between the MTA and the Union provides, in pertinent part, Article 33:

"Section 6. In the event that, pursuant to the preceding Sections 1 through 4 of this Article, either party gives written notice of amendment or modification of this Agreement, and negotiations fail to result in an Agreement between the parties, all issues in dispute shall be submitted to a Board of Arbitration on written demand of either party. . . ."

bargaining agreements in § 7-601 of the Transportation Article was limited to collective bargaining agreements covering employees who form or formed a part of an operating company that the MTA acquires or had acquired in the past, and that the thirty-five additional clerical employees did not fall into this category. The court concluded that

> "[s]ince . . . there is no legislative authorization for the MTA to recognize any representatives of employees other than representatives of former employees of operating companies acquired by the MTA, it follows that the MTA has no right or authority to do so. It is, therefore, irrelevant whether the MTA agreed by contract to recognize the Union as the representative of employees other than former employees of an operating company acquired by the MTA, because an illegal promise is clearly unenforceable. . . . The issue of the scope of the Union's representation will, therefore, not be referred to arbitration."

The Union appealed to the Court of Special Appeals. Before the case was heard in that court, the MTA filed in this court a petition for a writ of certiorari which we granted.

The Union appears to advance two alternate state law grounds for reversing the judgment of the Circuit Court. *First* the Union seems to contend that, even if the collective bargaining authorization in § 7-601 and the arbitration provision in § 7-602 (b) of the Transportation Article do not encompass the thirty-five additional clerical employees, nothing in these sections *prohibits* the MTA from arbitrating the representational issue and, depending upon the result of the arbitration, from entering into a collective bargaining agreement covering the wages, pension rights, etc. of these employees. Consequently, the Union argues, the MTA's alleged agreement to arbitrate this issue is valid and should be enforced. *Second* the Union asserts that § 7-601 is subject to varying interpretations, that the section should be

"liberally construed" to accomplish its purpose, and that, under such construction, the thirty-five additional clerical employees are encompassed by § 7-601. In our view, neither argument by the Union is sound.[4] Finding ourselves in agreement with the Circuit Court, we shall affirm.

## I.

Section 7-602 (b) of the Transportation Article provides for arbitration of labor disputes between the MTA "and any employees described in § 7-601" if collective bargaining fails to produce an agreement. Consequently, at the heart of this case is the scope and effect of the collective bargaining authorization in § 7-601. Section 7-601 permits the MTA to bargain collectively as to wages, salaries, hours, working conditions, and pension rights "with the accredited representatives of the employees who form part of any operating company" that the MTA acquires.

The Union's first argument is premised on the assumption that the collective bargaining authorization in § 7-601 does not include the thirty-five additional clerical employees. The Union, however, asserts that nothing in § 7-601 prohibits the MTA from entering a collective bargaining contract governing the wages, hours, working conditions and pension

---

4. The Union makes a third argument which can be quickly disposed of. It maintains that § 13 (c) of the Urban Mass Transportation Act of 1964 (often referred to as UMTA), 78 Stat. 307, as amended, 49 U.S.C. § 1609 (c), creates a federal cause of action governed by federal law, and that the "federal rights protected" by § 13 (c) "will readily entitle the Union to its judgment in this proceeding." (Union's Brief, p. 22.) The Union's position is that its asserted agreement with the MTA to arbitrate the representation dispute is enforceable under federal law regardless of any Maryland law to the contrary. Shortly after this case was argued before us, the Supreme Court of the United States rendered its opinion in Jackson Transit Auth. v. Local Division 1285, 457 U.S. 15, 102 S. Ct. 2202, 72 L.Ed.2d 639 (1982). The Jackson case compels a rejection of the Union's federal law argument. The Supreme Court there concluded (102 S.Ct. at 2210):

"Given this explicit legislative history, we cannot read § 13 (c) to create federal causes of action for breaches of § 13 (c) agreements and collective bargaining contracts between UMTA aid recipients and transit unions. The legislative history indicates that Congress intended those contracts to be governed by state law applied in state courts."

rights of these thirty-five employees, and thus the MTA is free to do so by agreement.

In our view, if an agreement with the Union covering the thirty-five additional clerical employees is not embraced by the terms of § 7-601, then that section does have the effect of prohibiting the MTA from bargaining collectively with those employees.

It is a settled principle of statutory construction that the Legislature's enumeration of one item, purpose, etc. ordinarily implies the exclusion of all others. *State Insurance v. Nationwide,* 241 Md. 108, 117, 215 A.2d 749 (1966); *Trust Co. v. Ward Baking Corp.,* 177 Md. 212, 220, 9 A.2d 228 (1939); *Railroad Co. v. Lichtenberg,* 176 Md. 383, 390, 4 A.2d 734, *appeal dismissed,* 308 U.S. 525, 60 S.Ct. 297, 84 L.Ed. 444 (1939); *Vanderford v. Farmers' Bank,* 105 Md. 164, 168, 66 A. 47 (1907) ("the express mention of one thing implies the exclusion of another"); 2A Sutherland, *Statutory Construction,* §§ 47.23, 47.24 (4th ed. 1973). The principle is often expressed as the latin maxim *"expressio unius est exclusio alterius," Gay Investment v. Comi,* 230 Md. 433, 438, 187 A.2d 463 (1963). A related principle is that where a statute authorizes or permits a person or agency to take a certain type of action in a particular manner, such manner becomes a mandatory limitation, and the action must be taken in conformity with it. *Trust Co. v. Ward Baking Corp., supra,* 177 Md. at 220 (" 'A statute that directs a thing to be done in a particular manner ordinarily implies that it shall not be done otherwise.' "); 2A Sutherland, *supra,* §§ 57.14-57.18.

Consequently, the statutory permission for the MTA to enter into collective bargaining agreements "with the accredited representatives of the employees who form part of any operating company that the Administration acquires," places a limitation upon the MTA's authority to enter collective bargaining agreements. The MTA may enter into such agreements only in accordance with § 7-601. If an agreement with the Union covering the thirty-five additional clerical employees is not within § 7-601, then such agreement is beyond the MTA's authority.

Apart from the principles of statutory construction discussed above, the Union's first argument would still lack merit. Even if § 7-601 were not construed as prohibiting collective bargaining agreements except in accordance with its terms, the result would be the same.

It is established in this State that, absent express legislative authority, a government agency cannot enter into binding arbitration or binding collective bargaining agreements establishing wages, hours, pension rights, or working conditions for public employees. *Maryland Cl. Emp. Ass'n v. Anderson,* 281 Md. 496, 508-513, 380 A.2d 1032 (1977); *Mugford v. City of Baltimore,* 185 Md. 266, 270-272, 44 A.2d 745 (1945). *See also City of Balto. v. Am. Fed. of St., Etc.,* 281 Md. 463, 379 A.2d 1031 (1977). As previously pointed out, the MTA is an agency of the state government. *See Comm'n On Human Rel. v. Mass Transit,* 294 Md. 225, 227, n.2, 449 A.2d 385 (1982); *Mass Transit v. Household Finance,* 292 Md. 313, 314, 439 A.2d 1104 (1982); *Harden v. Mass Transit Adm.,* 277 Md. 399, 354 A.2d 817 (1976); *MTA v. Balto. Co. Revenue Auth.,* 267 Md. 687, 690-691, 298 A.2d 413 (1973). Therefore, the mere absence of a prohibition against a collective bargaining agreement concerning the wages, working conditions, etc., of the additional clerical employees would not aid the Union's cause. Instead, under the *Anderson* and *Mugford* cases, the MTA may enter into only those collective bargaining agreements which are expressly authorized by statute.

Consequently, the outcome of this case depends upon the proper interpretation of § 7-601. The Union can prevail only if that statutory provision authorizes a collective bargaining agreement between the MTA and the Union concerning the wages, etc. of the thirty-five additional clerical employees.

## II.

In its alternative argument, that a collective bargaining agreement covering the thirty-five additional clerical employees is expressly authorized by the language of

§ 7-601, the Union claims that § 7-601 is ambiguous and subject to several possible interpretations. Next, the Union points to § 7-706 of the Transportation Article, which provides that the Mass Transit title of the article "shall be liberally construed to accomplish its purposes." The Union then argues that the authorizations to enter collective bargaining agreements and to arbitrate labor disputes in §§ 7-601 and 7-602 reflect a purpose of promoting industrial peace by collective bargaining and arbitration. Asserting that § 7-601 should be "liberally construed" to accomplish this purpose, the Union contends "that § 7-601 must be read to include not only those specific employees at the time of the takeover, *but all those employees affected by the consequences* of the takeover." (Union's brief, p. 11.) Finally, the Union seems to take the position that virtually all employees of the MTA are affected by the consequences of taking over the assets of the BTC. (Union's brief, p. 15.)

As previously set forth, § 7-601 empowers the MTA to

"deal with and make written contracts as to wages, salaries, hours, working conditions, and pension and retirement provisions *with the accredited representatives of the employees who form part of any operating company that the Administration acquires,* including the representative of any labor organization authorized to act for those employees." (Emphasis supplied.)

As applied to the facts of this case, there is little ambiguity regarding the identity of the employees described in § 7-601. They are persons who were employed by the BTC or other operating companies that the MTA acquired. It has been undisputed that the thirty-five additional clerical employees were not employed by any operating company acquired by the MTA.

What gives rise to an ambiguity in § 7-601 is not the description of employees but, as pointed out by the Union in its brief, the authorization to contract "with the accredited representatives of" those employees. The limitation upon the

MTA's contracting authority arguably relates to the nature of the representative rather than the nature of the employees to be covered. In other words, it is arguable that under the language of § 7-601, as long as the contract is "with the accredited representatives" of the former BTC employees, the contract itself may encompass other employees such as the additional thirty-five clerical employees.

The history of § 7-601, however, discloses that this ambiguity was inadvertently created in 1977 by the Revisor of the statutes relating to transportation. The intent of the Legislature underlying § 7-601 is clear.

We earlier pointed out that the statute creating the MTA and setting forth its powers, duties and responsibilities was Ch. 160 of the Acts of 1969, codified prior to 1977 as Art. 64B of the Code. What is now the labor subtitle, set forth in §§ 7-601 through 7-607 of the Transportation Article, was contained in a single section of the 1969 statute. Art. 64B, § 37, as enacted in 1969, provided in relevant part as follows:

"§ 37. Operations.

* * *

(b) *Labor contracts and labor disputes.* — The Authority may deal with and enter into written contracts with the employees of the Authority, who may form part of any operating company, which the Authority may acquire, through accredited representatives of such employees or representatives of any labor organization authorized to act for such employees concerning wages, salaries, hours, working conditions, and pension or retirement provisions.

In case of any labor dispute involving the Authority and such employees where collective bargaining does not result in agreement, the Authority shall submit such dispute to arbitration by a board composed of three persons, one appointed

by the Authority, one appointed by the labor organization representing the employees, and a third member to be agreed upon by the labor organization and the Authority. . . .

\* \* \*

(d) *Obligations of Authority upon acquisition of existing transit facilities.* — Whenever the Authority acquires existing transit facilities from a public or privately owned public utility either in proceeding by eminent domain or otherwise, the Authority shall assume and observe all existing labor contracts and pension obligations."

The first paragraph of § 37 (b) quoted above became § 7-601 in the 1977 recodification. But the ambiguity presently found in § 7-601 did not appear in § 37 (b). Instead of being authorized to contract with a particular union as the language of § 7-601 might suggest, under the language of former § 37 (b) the MTA was authorized to contract "with the employees of the Authority" who had been employees of an acquired operating company. Art. 64B, § 37 (b), clearly limited the collective bargaining authority of the MTA to former employees of an operating company acquired by the MTA.

When Art. 64B, § 37 (b), was changed to § 7-601 of the Transportation Article as part of the 1977 recodification, there was no indication of a legislative intent to broaden the MTA's collective bargaining authority. A change in the phraseology of a statute as part of a recodification will ordinarily not be deemed to modify the law unless the change is such that the intention of the Legislature to modify the law is unmistakable. *Bureau of Mines v. George's Creek,* 272 Md. 143, 155, 321 A.2d 748 (1974).

Moreover, the Revisor's Note to § 7-601 confirms that no substantive change was intended. The note states as follows:

"This section is new language derived without substantive change from the first paragraph of former Article 64B, § 37 (b)."

The notes or reports of a revisor or revision commission are entitled to considerable weight in ascertaining legislative intent. *Briggs v. State,* 289 Md. 23, 30-31, 421 A.2d 1369 (1980); *Bureau of Mines v. George's Creek, supra,* 272 Md. at 155; *Allers v. Tittsworth,* 269 Md. 677, 683, 309 A.2d 476 (1973).

In addition to the plain language of former Art. 64B, § 37 (b), the origin of that provision shows that the Legislature did not intend to grant broad collective bargaining authority to the MTA. Although the present MTA was created by Ch. 160 of the Acts of 1969, there existed a predecessor agency, also called the Metropolitan Transit Authority, created by Ch. 670 of the Acts of 1961 and lasting until 1969. The provisions of Ch. 670 were similarly codified as Art. 64B of the Code. Whereas the present MTA is essentially an operating agency, the Metropolitan Transit Authority existing from 1961 to 1969 was primarily a regulatory agency. The former agency, however, did have limited authority to acquire private transit systems and operate them.

Ch. 160 of the Acts of 1969, in creating the present MTA, repealed all of former Art. 64B of the Code and enacted an entirely new Article 64B. Nevertheless, one of the provisions of the former Art. 64B, enacted by Ch. 670 of the Acts of 1961, which was copied verbatim in the 1969 statute, was the collective bargaining authority contained in the first paragraph of Art. 64B, § 37 (b), and now in § 7-601 of the Transportation Article. As enacted in 1961, Art. 64B, § 7 (s) authorized the former Authority to

> "[d]eal with and enter into written contracts with the employees of the Authority, who may form a part of any operating company which the Authority may acquire, through accredited representatives of such employees or representatives of any labor organization authorized to act for such employees concerning wages, salaries, hours, working conditions, and pension or retirement provisions."

Ch. 670 of the Acts of 1961 was based upon the recommendations of a study commission. As proposed by the commission, and as initially introduced in the Legislature, the collective bargaining provision broadly authorized the Authority

> "[t]o deal with and enter into written contracts with the employees of the Authority through accredited representatives of such employees or representatives of any labor organization authorized to act for such employees concerning wages, salaries, hours, working conditions and pension or retirement provisions."

*Report of the Baltimore Metropolitan Area Mass Transit Legislative Commission,* p. 33 (1960). This provision, however, was severely limited by the General Assembly when it added to the bill, after the phrase "employees of the Authority," the following amendment:

> ", who may form a part of any operating company which the Authority may acquire,"

1961 Maryland House Journal, amendment no. 19, p. 1050. By adding this language the Legislature clearly intended to reject the Commission's recommendation and to prohibit the Authority from bargaining collectively with its employees generally. The purpose of the amendment was obviously to limit the coverage of collective bargaining agreements to employees of acquired companies.

We conclude, therefore, that the MTA's authority to enter into collective bargaining agreements and arbitrate labor disputes, set forth in §§ 7-601 and 7-602 (b) of the Transportation Article, is limited to agreements and arbitration concerning the wages, hours, working conditions and pension rights of persons who were employees of an operating company acquired by the MTA. Because the thirty-five additional clerical employees involved in this case had not been employees of the BTC or any other operating company acquired by the MTA, the MTA is not

authorized to enter into a collective bargaining agreement concerning their wages, etc., and is not authorized to arbitrate the matter.

*Judgment affirmed.*
*Respondents to pay costs.*