## ZONING AND PLANNING

**ADOPTION OF COMPREHENSIVE PLAN – WHETHER A LOCAL LEGISLATIVE BODY MAY REVISE THE PLAN APPROVED BY THE PLANNING COMMISSION WITHOUT FIRST RETURNING THE PLAN TO THE COMMISSION FOR ITS RECOMMENDATION**

November 18, 2014

*Honorable Patrick T. Rockinberg*
*Mayor, Town of Mount Airy*

You have asked for an opinion on the scope of the Mount Airy Town Council's authority to make changes to a comprehensive plan, or parts of a plan, that Mount Airy's Planning Commission has recommended for the Council's adoption. Specifically, you ask this question: In the event of significant disagreement between the Town Council and the Planning Commission regarding material aspects of a comprehensive plan or plan element, does the Town Council have the authority to adopt material changes to the comprehensive plan or plan element as formulated by the Planning Commission, or must the Town Council have the consent of the Planning Commission on any changes before adopting them? By letter dated June 4, 2011, the Town Attorney gave his views on this question, concluding that the Town Council may adopt "any changes to the [Planning Commission's comprehensive plan] that a majority of the Council deems necessary and appropriate."[1]

Respectfully, we disagree. We conclude that, under § 3-205(d)(1) of the Land Use Article,[2] the Town Council may either adopt or not adopt a comprehensive plan or plan element approved by the Planning Commission but may not adopt even minor substantive changes to the document without first returning the plan to the Commission for its recommendation.[3]

---

[1] We also had the benefit of input from a number of municipal and county attorneys who submitted analyses of the issue in response to inquiries from the Maryland Association of Counties and the Maryland Municipal League.

[2] Except as noted, all statutory references are to the Land Use Article or "LU" (2012, with 2013 Supplement).

[3] We reached the same conclusion in 1993, when we concurred with the Carroll County Attorney's analysis of this and related issues.

# I

# Background

Planning and zoning are part of the police power of the State. *See*, *e.g.*, *Mayor and City Council of Rockville v. Rylyns Enterprises, Inc.*, 372 Md. 514, 546 (2002) ("'Zoning is permissible only as an exercise of the police power of the State.'") (quoting *Cassel v. Mayor and City Council of Baltimore*, 195 Md. 348, 353 (1950)); *Halle Dev., Inc. v. Anne Arundel Cnty.*, 141 Md. App. 542, 554 (2001) (county authority to enact an adequate public facilities ordinance is "pursuant to its general police power and power to regulate planning and zoning"). A local government thus may exercise its zoning and planning powers "only to the extent and in the manner directed by the State Legislature." *West Montgomery Ass'n v. Maryland-Nat'l Cap. Park & Planning Comm'n*, 309 Md. 183, 186 (1987); *see also id.* at 198 (noting that a chartered county "is precluded, by the express and unequivocal language of the statute that granted it zoning power, from exercising that power in any manner other than that specifically authorized[.]"); *Cassel*, 195 Md. at 353 (stating that the local exercise of zoning authority is "confined by the limitations fixed in the grant by the State"); *Port Wardens of Annapolis v. Maryland Capital Yacht Club*, 261 Md. 48, 56 (1971) ("[T]he zoning powers of municipal corporations are derived from the State Enabling Acts and not from any general grant of the State's police power to municipal corporations.") (quoting *Lunter v. Laudeman*, 251 Md. 203, 209 (1968)).

The General Assembly, through enabling statutes, has delegated planning and zoning powers to local governments in varying degrees and subject to certain requirements. *See* Md. Code Ann., Local Gov't ("LG") §§ 5-203, 5-212, 5-213 (granting to municipalities legislative powers over general health and welfare, including powers to adopt planning and zoning controls and zoning regulations); LG §§ 10-102, 10-324 (same with respect to charter counties and code counties); Md. Code Ann., Land Use Article ("LU"), Division I (regarding planning and

---

Opinion No. 93-034 (Aug. 18, 1993), 1993 WL 343622 *7 (unpublished) (concluding that a local legislative body "can decline to adopt what the Planning Commission submits, but it cannot adopt a different proposal without sending that proposal to the Planning Commission").

zoning in non-charter counties and municipalities)[4] and Division II (regarding planning and zoning in Prince George's and Montgomery Counties); *see also Rylyns*, 372 Md. at 528 n.3 (tracing "the entire panoply of related enabling statutes in Maryland"). The scope of a municipality's planning power is primarily defined by the provisions in Titles 1 and 3 of the Land Use Article. The provision at issue in this opinion, § 3-205(d)(1), applies only to non-charter counties and to municipalities other than Baltimore City. Before turning to that provision, we review the legal framework that the General Assembly has prescribed for the preparation, approval, and adoption of local comprehensive plans in municipalities and non-charter counties.

Under the Land Use Article, every jurisdiction that exercises planning and zoning powers must adopt a comprehensive plan. *See* §§ 1-405, 3-101(a), 3-204(a). As described by the Court of Appeals, a comprehensive plan is "'a general plan to control and direct the use and development of property in a [locality], or a large part thereof, by dividing it into districts according to the present and potential use of the property.'" *Maryland-Nat'l Cap. Park & Planning Comm'n v. Greater Baden-Aquasco Citizens Ass'n*, 412 Md. 73, 85 (2009) (quoting E.C. Yokley, *Zoning Law and Practice* § 5.2 (4th ed. 2003)). "'[M]ore than a detailed zoning map,'" a comprehensive plan "'should apply to a substantial area, be the product of long study, and control land use consistent with the public interest. An important characteristic of a comprehensive plan is that it be well thought out and give consideration to the common needs of the particular area.'" *Id.* (also quoting Yokley).

The Land Use Article authorizes local jurisdictions to appoint a planning commission to make and approve a comprehensive plan and then recommend that plan to the legislative body for adoption. §§ 2-101, 3-202(a)(1). Planning commission members are ordinarily appointed or confirmed by the legislative body and may include one of the legislative body's own elected members in an *ex officio* capacity. § 2-102 (2014

---

[4] While Division I of the Land Use Article applies generally to all local jurisdictions, the vast majority of its provisions apply only to non-charter counties and municipalities, with only certain specific provisions applicable to charter counties and Baltimore City. *See* § 1-401 (list of provisions within Division I that apply to charter counties); § 10-103 (listing those provisions that apply to Baltimore City). This opinion does not address the planning law applicable to charter counties.

Supp.). Once appointed, a member of a planning commission must complete an education course on the role of the plan, the standards for special exceptions and variances, and the local jurisdiction's zoning and planning regulations. § 1-206 (2014 Supp.). Planning commissioners serve 5-year terms on a staggered basis; their terms thus do not necessarily coincide with those of the members of the legislative body that appointed them. *See* § 2-102(c) (2014 Supp.).

A planning commission may prepare and recommend to the legislative body three types of plans for adoption: (1) a "whole plan"; (2) "successive parts of the plan, which correspond to geographic sections or divisions of the local jurisdiction";[5] or (3) "an amendment to the plan." § 3-202(a)(1)-(2). The planning commission must review an approved plan at least once every 10 years to determine whether to revise or amend the plan, as necessary. § 3-301 (2014 Supp.). Specific local laws and actions—such as zoning ordinances, subdivision regulations, planned unit development ordinances, and the approval of special exceptions—must be "consistent with," and not "contrary to," a jurisdiction's plan. § 1-101(p) (2014 Supp.), § 1-303.

A non-charter county or municipal planning commission must "make the plan with the general purpose of guiding and accomplishing the coordinated, adjusted, and harmonious development of the local jurisdiction and its environs." § 3-201(a)(2). The commission is required to "carefully and comprehensively" survey and study present conditions in the jurisdiction, projections for future growth, and "the relation of the jurisdiction to neighboring jurisdictions." § 3-201(a)(1). The commission is further charged with promoting public interest in, and understanding of, the jurisdiction's plan, and it must consult with other public officials, stakeholder agencies and organizations, and citizens about "protecting or executing the plan." § 3-201(d).

As to the content of the plan, the Land Use Article sets forth twelve "visions" that "the planning commission shall implement . . . through the comprehensive plan." § 1-201; *see also* § 3-201(c). The plan must implement these visions through

---

[5] A plan for a geographic section or divisions, commonly referred to as a "sector plan," relates to a discrete geographical area of the jurisdiction.

certain mandatory "elements," which address land use, transportation, water resources, sensitive areas, and other topics. *See* §§ 3-102 through 3-113. The plan may also include optional elements to address subjects such as community renewal, conservation, housing, natural resources, and the general location and extent of public utilities. § 3-102. These considerations are not to be addressed in isolation: "The elements of the plans shall be interrelated and each element shall describe how it relates to each of the other elements." § 3-202(b)(2).

After a planning commission prepares a whole plan, sector plan, or a plan amendment, it must hold at least one public hearing on the proposed plan and circulate it to adjoining jurisdictions and the State units and other local jurisdictions responsible for financing or constructing the public improvements necessary to implement the plan. § 3-203(b), (c) (2014 Supp.). The planning commission then may resolve to "approve the plan or any part of or amendment to the plan." § 3-203(e) (2014 Supp.). Following approval of the plan, "[a]n attested copy of the plan or part of the plan shall be certified to the legislative body." § 3-203(f) (2014). The planning commission must also send to the legislative body the recommendations received from "each unit and jurisdiction that comment[ed] on the plan." § 3-203(d) (2014 Supp.).

The section of the Land Use Article at issue here, § 3-205(d), addresses the actions that the legislative body may take in response to the planning commission's recommendation. Section 3-205(d)(1) provides:

> The legislative body may adopt: (i) the whole plan; (ii) a plan for one or more geographic sections or divisions of the local jurisdiction; or (iii) an amendment or extension of or addition to the plan.

The statute does not provide an opportunity for the public to comment during the legislative body's consideration of the plan. If the legislative body "fails to act" within 60 days after the date an approved plan or plan amendment has been submitted to it by the planning commission, then the plan "shall be considered approved" by the legislative body.[6] § 3-205(d)(2).

---

[6] Subsections (a) through (c), though contained within § 3-205, are unrelated to the process by which comprehensive plans are prepared,

**II**

**Analysis**

### A. *The Plain Language of §§ 3-202 and 3-205 of the Land Use Article*

The Land Use Article does not expressly address your question about a legislative body's authority to materially change a plan approved by the planning commission. Two sections address the authority of a legislative body. Section 3-204 provides that "[e]ach local jurisdiction shall adopt a plan that includes: (1) the [required] elements . . . ; and (2) the visions set forth in § 1-201 of this article." Section 3-205—the focus of your question and our inquiry—provides that the local legislative body may adopt a "whole" plan, a sector plan, or an "amendment or extension of or addition to" a plan, § 3-205(d)(1), but does not address whether the legislative body may materially change the planning commission's approved plan. For example, the provision authorizes the legislative body to adopt an "amendment" to a plan, but it is not clear whether this refers to the same "amendment" that the planning commission recommended or to a *new* amendment of whatever the commission recommended, be it a whole plan, sector plan, or plan amendment.

The ambiguity is not resolved when § 3-205 is read in conjunction with the options available to the planning commission under § 3-202. In both sections, the General Assembly used nearly identical terms to describe what type of plan the planning commission could recommend and the legislative body could adopt. *Compare* § 3-202(a)(2) (authorizing the planning commission to adopt "(i) the whole plan; (ii) successive parts of the plan, which correspond to geographic sections or divisions of the local jurisdiction; and (iii) an amendment to the plan"), *with* § 3-205(d)(1) (authorizing the

---

approved, and adopted. Rather, § 3-205(a) and (b) provide that, in jurisdictions where the legislative body has adopted the planning commission's approved plan, certain streets, parks, and public improvements must be reviewed by the planning commission for a determination as to whether a proposed project is consistent with the plan. The legislative body may, pursuant to 3-205(c)(3), "overrule" the planning commission's determination with respect to such projects by a two-thirds vote.

legislative body to approve "(i) the whole plan; (ii) a plan for one or more geographic sections or divisions of the local jurisdiction; or (iii) an amendment or extension of or addition to the plan"). This use of nearly identical terms to describe the two bodies' options could be read to limit the local legislative body to adopting what the commission had proposed.

We recognize that there are slight differences in the terms used in subparagraphs (ii) and (iii), but they appear to us to be non-substantive. That seems fairly clear with respect to (ii); despite the slight wording differences, the two provisions unmistakably describe what is commonly known as a "sector plan." It is less clear with respect to (iii), where the inclusion of the phrase "extension of or addition to" in § 3-205, but not in § 3-202, would seem to weigh against the conclusion that the General Assembly intended to limit the legislative body's options to approving or disapproving that which the planning commission had recommended. But the phrase "extension of or addition" originally *did* appear in what is now § 3-202; it was only removed during the 2000 code revision process related to former Article 66B. *See* 2000 Md. Laws, ch. 426 at 2321-22 (revising Article 66B, §§ 3.07(a)(3), (b)(1) and (e)(1)).[7] Because the revisions were made pursuant to code revision, we must consider them to be non-substantive "absent the clearest legislative intent." *See Nationwide Mutual Ins. Co. v. United States Fidelity & Guaranty Co.*, 314 Md. 131, 147 (1988) (internal quotation marks omitted).

Here, the indications of legislative intent are not so clear. The fiscal note expressly states that the 2000 code revision made "no substantive change from current law." Fiscal Note, S.B. 624 (2000). More specifically, the drafter's note that accompanied the 2000 code revision indicates that the alteration of § 3-202 was not intended to be substantive, but to remove a redundancy: "[T]he former references to 'or extension of or addition' and 'extension, or addition,' respectively are deleted as included within the reference to 'amendment.'" 2000 Md. Laws, ch. 426 at 2323. A subsequent Revisor's Note accompanying the transfer of former Article 66B into the Land Use Article, however, seems to indicate that the term "extension"—which, by that time, remained in the provisions relating to the legislative body but not those relating to

---

[7] The language was thus altered from the "commission may recommend adoption of . . . any amendment or extension of or addition to the plan," to how § 3-202(a)(2) currently reads: the "commission may recommend adoption of . . . an amendment to the plan."

the planning commission—might have substantive meaning after all:

> The Land Use Article Review Committee also notes, for consideration by the General Assembly, that under subsection (d)(1)(iii) of this section, it is unclear whether the "extension" of a plan that may be adopted is a geographic or a temporal extension. The General Assembly may wish to clarify this provision.

§ 3-205, Revisor's Note.

These conflicting indications do not amount to the type of "clearest legislative intent" that would be required to ascribe substantive significance to the fact that the phrase "extension of or addition" appears in what is now § 3-205 but not in § 3-202. The language in the two provisions is thus substantively the same. The General Assembly's decision to limit a local legislative body to the same options available to the planning commission suggests to us, as a textual matter, that the legislative body may act only on what the commission recommends, whether that be a whole plan, a sector plan, or a plan amendment. But because the suggestion is not so strong as to foreclose other interpretations, we believe the statute remains ambiguous on this point. *See Bourgeois v. Live Nation Entm't, Inc.*, 430 Md. 14, 27 (2013) (statute is ambiguous if "subject to more than one interpretation").

In addressing statutory ambiguities, we are to keep in mind that "[t]he ultimate goal in construing and applying a statute is to 'discern the actual intent of the [L]egislature in enacting it.'" *Ali v. CIT Tech. Fin. Servs*., 416 Md. 249, 260 (2010) (quoting *Chow v. State*, 393 Md. 431, 443-44 (2006)). To discern legislative intent, we must "look[] to the statute's legislative history, purpose, and structure, as well as to case law." *Bourgeois*, 430 Md. at 27; *see also Green v. Church of Jesus Christ of Latter-day Saints*, 430 Md. 119, 135 (2013) ("When the words of a statute are ambiguous, we attempt to resolve that ambiguity 'by searching for legislative intent in other indicia, including the history of the legislation or other relevant sources intrinsic and extrinsic to the legislative process.'") (quoting *Gardner v. State*, 420 Md. 1, 9 (2011)). Here, we will turn to the legislative history of § 3-205, and particularly to the views of the Department of Legislative Services' Code Revision Committee. As the Court of

Appeals has instructed, the Revisor's Notes, "though not part of the statute, 'are entitled to considerable weight in ascertaining legislative intent.'" *See Blevins & Wills v. Baltimore County*, 352 Md. 620, 643 (1999) (quoting *Office & Prof. Employees Int'l v. MTA*, 295 Md. 88, 101 (1982)).

## B.    *The 2012 Code Revision*

In 2011, the Land Use Article Review Committee ("Committee") of the Department of Legislative Services reviewed Articles 66B and 28 for purposes of creating the Land Use Article.[8]  The primary purpose of the code revision, enacted in 2012, was to modernize and clarify the applicable land use provisions, without making substantive changes to the law.  *See Summary Report on Chapter 426 of the Acts of 2012*, *Land Use Article* at 1.  As part of the code revision process, the Committee used Revisor's Notes "to call to the attention of the General Assembly policy issues that are beyond the purview of the revision process."  *Id.*

The Revisor's Note to § 3-205 directly addressed the authority of a legislative body to amend a comprehensive plan as prepared and approved by a planning commission.  In that note, the Committee concluded that the current law (former Article 66B, § 3.08) did *not* authorize the legislative body to make changes to a planning commission's plan.  Specifically, the note reads:

> The current provision *forces the legislative body to approve or reject the recommended plan or amendment outright*, which might be considered cumbersome by both bodies, and might unnecessarily prolong an adoption process that may involve the need to make minor changes to a recommended plan or amendment.  Similarly, in most local jurisdictions, it is unclear which body has the final say in plan adoption, and there is no provision to determine how a dispute

---

[8]    See http://dls.state.md.us/Content.aspx?page=76 (last visited on Nov. 11, 2014) for a description of the Code Revision effort, including its history and background.  The Land Use Article Review Committee was chaired by the Honorable Glenn Harrell, Jr., a judge on the Maryland Court of Appeals.

> between the legislative body and the
> planning body may be resolved.

§ 3-205, Revisor's Note (emphasis added). Having noted the "cumbersome" aspects of the provision, the Committee then recommended that the General Assembly consider amending the section to provide a mechanism for a legislative body to, among other things, remand all or part of a comprehensive plan to the planning commission with recommended changes. *Id.* The General Assembly did not adopt that recommendation when it revised and recodified the former Article 66B in 2012; instead, the General Assembly adopted the recodification of the "current provision" without substantive change.[9] Affording the Committee's interpretation the "considerable weight" it is due, *Blevins*, 352 Md. at 643, the Revisor's Note suggests strongly that the legislative body is not authorized to adopt substantive alterations or amendments to a comprehensive plan that is prepared and approved by a planning commission.

## C.   *The Legislative History*

We turn next to the legislative history of the relevant provisions to see whether it suggests a different outcome. The provisions of former Article 66B were first enacted by the General Assembly in 1927 after the landmark decision by the United States Supreme Court in *Village of Euclid v. Ambler*

---

[9] The 2012 code revision also altered the language of former Art. 66B § 3.08(c)(2)(ii) to provide that the legislative body "may adopt" a plan, § 3-205(d)(1), where the prior version read "shall adopt." Ordinarily, we would think that a change from "shall" to "may" would be considered substantive, but the change does not bear on the issue we address here because it does not affect the options available to the legislative body. Moreover, the fact that the recommendation of the planning commission "shall be considered approved if the legislative body fails to act within 60 days," § 3-205(d)(2), already implies that the legislative body might elect not to act. The Committee may have understood that the statute's use of the word "shall" did not accurately describe the legislative body's obligation under the statute. *See also Director*, *Patuxent Inst. v. Cash*, 269 Md. 331, 344 (1973) ("[I]t is well settled that the use of the words 'shall' or 'may' [is] not controlling, in determining whether a particular provision is mandatory or directory . . . . The question of construction turns upon the intention of the Legislature as gathered from the nature of the subject matter and the purposes to be accomplished." (internal quotation marks omitted)).

*Realty Co.*, 272 U.S. 365 (1926), which upheld local zoning as a valid exercise of the "police power." *See* 1927 Md. Laws, ch. 705; *see also Lipsitz v. Parr*, 164 Md. 222, 228-29 (1933). The statute was amended in 1933 to authorize the creation of a planning commission and the preparation, approval, and adoption of local comprehensive plans. 1933 Md. Laws, ch. 599. The 1933 amendments were patterned after the "Standard State Zoning Enabling Act" and the "Standard City Planning Enabling Act," which the U.S. Department of Commerce had published in 1924 and 1928, respectively. 93 *Opinions of the Attorney General* 103, 106 n.6 (2008). In fact, Maryland borrowed some provisions of the model zoning act verbatim, *Anderson House, LLC v. Rockville*, 402 Md. 689, 713 (2008), and adopted the model planning act "virtually word for word." *See* Maryland Planning and Zoning Law Study Commission, *Interim Report: A Review and Discussion of Development Trends in Maryland* (1968) (the "*Interim Study Commission Report*") at 9. Although the General Assembly has made various changes over the years to its original enactments of the model act provisions, it has adhered to two related goals of the model acts: first, that a locality's land-use decisions be made in accordance with a long-term and carefully-created planning document, and, second, that the creation of a plan be insulated to some degree from short-term political pressures on a locality's elected officials.

### 1. The Model Acts and Maryland's Original Enabling Statutes.

Under the model acts, local jurisdictions were not required to prepare and approve a comprehensive plan, but merely empowered to do so. U.S. Dep't of Comm., The Advisory Committee on City Planning and Zoning, "A Standard City Planning Enabling Act" at 7, n.7 (1928) ("Model Planning Act"). The Model Planning Act envisioned, however, that the comprehensive planning process—which was distinct from the zoning process—should be carried out by a permanent planning commission, whose job would be to create the comprehensive plan and update the plan as needed. *See id* at iii ("Forward" by then Secretary of Commerce Herbert Hoover). The model provisions indicated that a planning commission was to "make and adopt a master plan" for the jurisdiction, *id*. at 13 (§ 6), and make "amendments" and "extensions" thereof. *Id.* at 18 (§ 8). Further, the drafters of the Model Planning Act contemplated that a planning commission should "not only make the plan but also have a strong influence in protecting the plan against departures and in getting the plan carried out . . . ." *Id.* at 7, n.8. To this end,

the model act included a provision that buildings, utilities, or other public improvements should be approved by the planning commission, and that a planning commission's determination on such improvements could be overruled by the legislature only upon a super majority vote. *Id*. at 19-21 (§ 9). As detailed above, these model provisions have been carried forward, either in whole or part, to the Land Use Article.

Of particular relevance here, the drafters of the Model Planning Act understood that the roles of planning and legislation "are quite different from each other and involve differing considerations, differing points of view, and differing talents and interests." *Id.* at 18, n.44. As a result, the two roles "need to be reposed in two separate bodies," with the planning commission, or "board," entrusted with the planning process. *Id.*; *see also id.* at 7, n.8. The drafters envisioned the "planning board" as the "organ of the municipal government which performs [the] planning function," and they explained that "within its sphere it needs the same independence, specialized qualification, and permanence as the other organs of the city government need in their respective spheres." *Id*. at 7, n.8.

The drafters of the Model Planning Act also explicitly distinguished the "planning function" from the "legislative function." They noted that legislators serve only for the length of their elected terms, with their "time and energies taken up with the problems of current legislation and current control of the public moneys." *Id*. at 7, n.10. Comprehensive planning, by contrast, is by its nature "a continuous and permanent" endeavor, *id*. at 7, n.8, designed "for a long period of future years . . . cover[ing] the incumbency of many successive [legislators]." *Id*. at 7-8, n.10. The drafters therefore concluded that a planning commission "should be free from the pressures of purely current problems." *Id*. The role of planning, as the drafters saw it, should thus be "intrusted to a board or body specially chosen for the purpose and given a place in the structure of the government specially appropriate to the nature of this planning work." *Id*. And "[f]or these reasons the plan should not be required to be submitted to or approved by [the] council." *Id*. at 18 n.44.

Consistent with these principles and goals, Maryland's enabling act, as originally enacted, charged a jurisdiction's planning commission with the duty to both "make *and adopt*" the comprehensive plan. 1933 Md. Laws, ch. 599, § 6 (codified at

Art. 66B, § 15 (1935 Supp.) (emphasis added)). At the time, a jurisdiction's legislative body had no role in the comprehensive planning process. Regarding plan adoption, the planning commission had the same three options that it currently has under § 3-202: It could adopt (i) "the plan as a whole," (ii) "successive parts of the plan . . . corresponding with major geographical sections or divisions" of the jurisdiction, or (iii) "any amendment or extension thereof or addition thereto." *Id*. § 8 (codified at Art. 66B, § 17 (1935 Supp.)).

### 2. 1970 Revision of Article 66B

In 1966, the General Assembly established the Maryland Planning and Zoning Law Study Commission (the "Study Commission"), and directed it "to make a comprehensive review of the State's planning and zoning laws." *Interim Study Commission Report* at iii. The Study Commission observed that Article 66B, consistent with the intent of the drafters of the model acts, treated the comprehensive planning function and the local zoning function as "two separate acts," with the planning undertaken by the planning commission and zoning by the legislative body. *See* Maryland Planning and Zoning Law Study Commission, *Final Report: Legislative Recommendations* (1969) (the "*Final Study Commission Report*"), Appendix A at 26. The Study Commission believed that the separation of the two functions led to the "fragmentation" of, and lack of elective accountability in, the planning process. *Interim Study Commission Report* at 13. Because the comprehensive plans were adopted by unelected planning commissions, they "lack[ed] legal sufficiency" and were "all too often . . . ignore[d]" by local governments. *Final Study Commission Report* at 2, *see also id.*, Appendix A at 26 (the comprehensive plan "lacks any significant legal weight" if not adopted by the legislative body). Accordingly, the Study Commission expressed the view that "the planning process should be organized in such a way that it gives elected officials responsibility for the course and character of development."[10] *Interim Study Commission Report* at 2; *see also id.* at 13, 90.

---

[10] While the Study Commission understood that the purpose of having a separate planning commission prepare the comprehensive plan was to take the planning function "out of politics," it concluded that this had led to "a failure in the coordination of planning for public facilities, a lack of success in effective land use planning, [and] unclear lines of authority and responsibility for development decisions." *Interim Study Commission Report* at 12-13. The Study Commission

Among its numerous recommendations, the Study Commission proposed making comprehensive planning part of the political process by giving the local legislative body the authority to adopt the comprehensive plan. *Final Study Commission Report* at 2, Appendix A at 26. By "officially accepting the plan, the legislators [would] accept its ideals and goals as the correct guidelines" for the community and give the plan "an increased status in the eyes of the law." *Id*., Appendix A at 26.

In 1970, the General Assembly substantially revised and re-numbered Article 66B, and in doing so enacted many of the revisions proposed by the Commission. *See* 1970 Md. Laws, ch. 672. The legislation divested the planning commission of the power to adopt the comprehensive plan and, instead, gave that power to the legislative body. *Id*. at 1891, 1894, 1895-96. To implement this change, the General Assembly amended and re-codified former Article 66B, § 17 as Article 66B, § 3.07 such that the planning commission would no longer "adopt" the plan but "recommend adoption" of the plan. *Id*. at 1894. The new Article 66B, § 3.07, however, kept substantially intact the three options available to the planning commission: It could recommend adoption of (i) "the plan as a whole," (ii) "successive parts of the plan . . . corresponding to major geographical sections or divisions of the jurisdiction," or (iii) "any amendment or extension thereof or addition thereto." *Id*.

Regarding adoption of the plan by the legislative body, the General Assembly amended and re-codified former Article 66B, § 18 as Article 66B, § 3.08, and added a new provision:

> Adoption of the Plan – The local legislative body shall adopt the plan as a whole or for one or more major geographic sections or divisions of the jurisdiction, and further shall adopt any amendment or extension thereof or addition thereto.

1970 Md. Laws, ch. 672 at 1895-96. The General Assembly, however, did not adopt all the revisions proposed by the

---

further concluded that the local legislative body, more so than the planning commission, had the tools and responsibility to obtain through the elective process "a reading on community values" that would enable it to protect the "quality of the human environment." *Id.* at 13.

Commission.  Of significance here, the Study Commission had recommended adding the following language to the Article 66B, § 3.08 adoption provision:

> If the local legislative body desires to amend the plan without the approval of the planning commission, the local legislative body shall hold a public hearing on said amendment before any such action is taken.

*Final Study Commission Report*, Appendix A, at 26.  The bill as introduced to the General Assembly in 1970 included that language, word-for-word,[11] but it was later struck from the bill. For our purposes, the General Assembly's decision to reject this language indicates that it did not intend for the legislative body to be able to change a plan prepared by the planning commission. Instead, the General Assembly adopted only the portion of the Study Commission's recommendation that proposed giving the legislative body the authority to "accept" the planning commission's plan as a way of providing legal weight to the plan.[12]

---

[11]  As introduced, the full Article 66B, § 3.08 provision read:

> The local legislative body shall adopt the plan as a whole or parts thereof and further, shall adopt any amendment or extension thereof or addition thereto. *If the local legislative body desires to amend the plan without the approval of the planning commission*, *the local legislative body shall hold a public hearing on said amendment before any such action is taken*.

1970 Md. Laws, ch. 672, at 1895 (emphasis added).

[12]  One might read the offered but rejected language to mean that the legislative body had the authority to "amend the plan without the approval of the planning commission," but that if it chose to exercise that authority, it would first have to hold a public hearing on the amendment.  However, if read this way, one would also have to conclude that the General Assembly, in rejecting the language, determined that it would be unnecessary for the legislative body to seek public input prior to changing a plan as approved by the planning commission.  Given the extensive public involvement in the plan development process before the planning commission, we think it unlikely that the General Assembly would have authorized a local legislative body to substantively alter the commission's proposal without any public input whatsoever.

### 3. 2000 Amendments Relating to Frederick County

In 2000, the General Assembly specifically and exclusively granted to the Frederick County Board of Commissioners the authority to "overrule an action of the Frederick County planning commission," including the planning commission's approval of a comprehensive plan. *See* 2000 Md. Laws, ch. 427 at 2385 (Art. 66B § 14.06, subsequently re-codified with non-substantive changes at LU § 9-1002). We find two aspects of this legislation noteworthy. First, the legislation would not have been necessary if § 3-205 had already conferred on a local legislative body the power to amend the plan recommended by the planning commission. Cardinal rules of statutory construction caution against an interpretation that renders such statutory exceptions unnecessary. *See DeBusk v. Johns Hopkins Hosp.*, 342 Md. 432, 445 (1996).

Second, the legislation's use of the term "overrule" in this provision, but not § 3-205, seems significant. It demonstrates that the Legislature evidently knows how to authorize a local legislative body to take action contrary to the planning commission's recommendation, but it chose not to do so in § 3-205(d).[13] *Cf. Dutta v. State Farm Insur. Co.*, 363 Md. 540, 552 (2001) (citing exemption for workers compensation benefits as evidence that the Legislature "knows how" to create exemptions but had "not elected to do so" for HMO benefits). These considerations further suggest that the General Assembly did not intend § 3-205 to grant local legislative bodies the authority to revise the planning commission's decision to approve a comprehensive plan.

---

[13] The term "overrule" also appears in § 3-205(c)(3), regarding approvals for the construction of, among other things, certain streets, parks, open spaces, and public buildings. The planning commission has the authority to approve the "location, character, and extent of the development as consistent with the [comprehensive] plan," but the legislative body "may *overrule* the decision of the planning commission" by a two-thirds vote. § 3-205(b), (c)(3) (emphasis added).

### 4. The Smart and Sustainable Growth Act of 2009

The final piece of legislative history we evaluate is the enactment of the Smart and Sustainable Growth Act of 2009. Prior to 2009, Art. 66B § 3.01(a) authorized, but did not require, the adoption of a comprehensive plan: "A local jurisdiction may enact, adopt, amend, and execute a plan as provided in this article and create a planning commission . . . ." 2009 Md. Laws, ch. 181 at 988. Moreover, comprehensive plans were considered "advisory, guides only, and not normally mandatory insofar as rezonings, special exceptions, conditional uses and the like are concerned." *Trail v. Terrapin Run, LLC*, 403 Md. 523, 535 (2008).

In response, the General Assembly enhanced the status of comprehensive plans in two ways. First, it made the adoption of a comprehensive plan mandatory by amending Art. 66B § 3.01(a) to substitute the word "shall" for "may." *See* 2009 Md. Laws, ch. 181 at 988. Second, the General Assembly expressly overturned *Terrapin Run* and specified that local zoning laws and development regulations, among other things, must "further, and not be contrary to," the comprehensive plan. 2009 Md. Laws, ch. 181, at 984 (§ 2); *see id.*, § 3 (providing in the uncodified portion of the Act that "this Act overturn[s] the Court of Appeals ruling in David Trail et al. v. Terrapin Run LLC").

In other respects as well, the enactment of the Smart and Sustainable Growth Act of 2009 served to emphasize the importance of the comprehensive plan and how it is prepared. For example, in the Preamble to the Act, the General Assembly stated that "[c]itizens invest countless hours in determining the future direction of their jurisdiction through local comprehensive plans" and "are best served if land use decisions are consistent with locally adopted comprehensive plans." 2009 Md. Laws, ch. 181 (Preamble). And in explaining its response to the *Terrapin Run* decision, the Legislature emphasized "the importance of making land use decisions that are consistent with the comprehensive plan." *Id.* The General Assembly then stated its "intent . . . that comprehensive plans should be followed as closely as possible while not being elevated to the status of an ordinance and that deviations from the plan should be rare . . . ." 2009 Md. Laws, ch. 181 (Preamble).

We draw two principal conclusions from our review of the relevant legislative history. First, dating to the adoption of the Model Planning Act, the General Assembly charged the planning commission with the often technical task of preparing a

jurisdiction's comprehensive plan. Plan preparation must be based upon a "careful[] and comprehensive[]" study of the jurisdiction's conditions and projections for growth, Model Planning Act, § 7 (codified at LU § 3-201(a)(1)), and must be completed by the planning commission only after extensive consultation with public officials and other stakeholders. *Id.* § 10 (codified at LU § 3-201(d)). And once the plan is in place, it is the commission's responsibility to review the plan, *id.* § 6 (codified at LU § 3-301(a)), recommend programs to implement the plan, *id.* § 10 (codified at LU § 3-302), and consult with other agencies about "protecting and executing" the plan, *id.* § 10 (codified at LU § 3-201(d)(2)). From its inception, the planning commission has been viewed as an independent and specialized body formed specifically for these purposes. In contrast, § 3-205(d) specifies no distinct role or responsibility for the legislative body regarding technical review or development of the plan; it only empowers the legislative body to "adopt" the plan.

Second, the Legislature provided for extensive public involvement during the plan development process before the planning commission, but not during the process by which the local legislative body adopts the plan. Whereas the planning commission must hold a public hearing on the plan, Model Planning Act, § 8 (codified at LU § 3-203(b))), and consult with citizens about the plan's contents, *id.* § 10 (codified at LU § 3-201(d)), the statute provides no opportunity for citizens to comment on the plan once it is submitted to the legislative body for adoption. We think it unlikely that the General Assembly intended to give local legislative bodies the power to substantively alter the plan without any public input into the relative merits of the those alterations. Given that a local jurisdiction's authority in matters of planning and zoning is limited as directed by State statute, we see little basis in the statutory scheme for giving the legislative body's authority to "adopt" an expansive interpretation.

Accordingly, we conclude that § 3-205(d)(1) currently does not authorize a legislative body to adopt substantive alterations or amendments to a comprehensive plan as prepared and approved by a planning commission. This does not mean that a local legislative body must adopt the proposed plan "word for word and comma for comma," Opinion No. 92-010 (April 16, 1992), 1992 WL 674718 at *3 (unpublished); it may correct any clerical errors and other non-substantive mistakes. But a legislative body may not make even minor substantive changes without returning the

plan to the commission for its recommendation. *See* § 3-205, Revisor's Note (indicating that, under current law, even "minor changes" must be sent back to the commission). Although that may prolong the process of adopting a comprehensive plan, it best reflects the language and legislative history of the operable provisions and ensures that the important decisions embodied within the plan are agreed to by both the technical body and the body that is accountable to the electorate.

## III

### Conclusion

Section 3-205(d)(1) of the Land Use Article does not grant to the Mount Airy Town Council the authority to adopt material changes to a comprehensive plan, or plan element, once the plan or plan element has been prepared and approved by the Town's Planning Commission. Instead, a local legislative body's authority to influence the content of a plan or plan amendment is limited to (i) voting not to adopt the plan or plan amendment as approved by the planning commission and (ii) sending the plan back to the planning commission with recommendations that it be revised.

Douglas F. Gansler
Attorney General of Maryland

Adam D. Snyder
Chief Counsel, Opinions & Advice

\* Paul J. Cucuzzella, Assistant Attorney General, contributed significantly to the preparation of this opinion.