*Paul Moore v. RealPage Utility Management, Inc.*, Misc. No. 1, September Term, 2021. Opinion by Getty, C.J.

**PUBLIC UTILITIES — ENERGY ALLOCATION FOR APARTMENTS — PUBLIC SERVICE COMMISSION APPROVAL**

The Court of Appeals held that Maryland Code (1998, 2020 Repl. Vol.), Public Utilities Article § 7-304 prohibits the use of energy allocation equipment and procedures that the Public Service Commission has not approved to bill energy charges to tenants of properties built prior to 1978.

United States District Court
For the District of Maryland
Case No. 8:20-cv-00927 PWG

Argued: September 9, 2021

IN THE COURT OF APPEALS

OF MARYLAND

Misc. No. 1

September Term, 2021

_____

PAUL MOORE

v.

REALPAGE UTILITY MANAGEMENT, INC.

_____

Getty, C.J.
McDonald,
Watts,
Hotten,
Booth,
Biran,
Battaglia,
   (Senior Judge, Specially Assigned)

JJ.

_____

Opinion by Getty, C.J.

_____

Filed: November 30, 2021

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

In Maryland, the Public Service Commission ("PSC") is charged with regulating public utilities such as gas, electricity, telephone, water, and sewage disposal companies, in order to ensure safe, reliable, and economical utility services to the citizens of Maryland. For residential electric and gas service in buildings constructed since July 1, 1978, the statutorily required method for determining an apartment tenant's utility bill is to measure the actual amount of gas and electricity consumed by that tenant using an individual meter or submeter. This method rests on the principle that a tenant should only pay for gas and electricity consumed by the tenant's unit over the course of a billing period, which ensures fairness in the measurement and billing process.

When the Maryland General Assembly required the installation of individual meters in new construction as of July 1, 1978, it did not retroactively apply this requirement to existing apartment buildings. Apartment buildings constructed prior to 1978 that only have a master meter allocated energy costs to tenants by two methods: (1) square footage computation and pro rata assessments; or (2) added rental components.[1] While the PSC has regulatory responsibility over some types of metering, such as individual meters and submetering, from the PSC's perspective, the above-referenced methods of allocating a tenant's energy costs for apartment buildings constructed prior to 1978 are not, and have never been, within the PSC's purview. *See* Letter from Frank Heintz, Public Service

---

[1] We use the term "added rental components" to refer to utility charges that are established in a lease agreement that would be included in the monthly rental payment.

Commission Chairman, to the Honorable Wayne A. Cawley, Jr., Department of Agriculture Secretary in legislative bill file for Senate Bill 899 (1987).

A new system of calculating a tenant's monthly gas and electric bill was introduced in the mid-1980s for apartments having a master meter instead of individual meters or submeters. This system did not calculate the actual use of a tenant's gas and electricity consumption, nor did it allocate energy charges solely on the basis of square footage computations and pro rata assessments. Instead, the system relied upon various components of measurement, such as the number of seconds a valve was open on a furnace ("furnace runtime") to compute a tenant's utility charges. Therefore, this system was not within the PSC's definition of a submeter and resulted in a wholly unregulated method of allocating rental utility charges. Tenants of landlords that utilized these new energy allocation systems expressed concern over a system that had no regulatory oversight. Accordingly, the General Assembly attempted to remedy these concerns by considering legislation in the 1987 and 1988 Legislative Sessions.

As such, today, if a property owner or residential utility billing service company uses an energy allocation system to calculate the amount of gas or electricity consumed by an individual apartment unit, they must confirm that the method has been approved by the PSC. In the approval process, the PSC ensures that the energy allocation system results in a reasonable determination of the cost of the energy consumed by an individual apartment unit. *See* COMAR 20.26.02.01(A). Accordingly, this approval provides residential apartment tenants with a safeguard against arbitrary and unreliable energy allocation equipment and procedures calculating their gas and electricity bills.

2

Before this Court is a certified question of law from the United States District Court for the District of Maryland ("federal district court") that arises in the context of a putative class action lawsuit brought by Appellant Paul Moore, on behalf of residential apartment tenants, against Appellee RealPage Utility Management, Inc., a residential utility billing services company working on behalf of landlords in Maryland. The federal district court asked this Court to determine whether, for apartment houses built prior to 1978, methods of energy allocation that determine the billable amount of gas or electricity by means other than by the actual measurement of consumption of the individual unit are subject to the PSC's approval as set forth in Maryland Code ("Md. Code") (1998, 2020 Repl. Vol.), Public Utilities Article ("PU") § 7-304.

Based upon a plain language analysis of PU § 7-304, its corresponding Code of Maryland Regulations ("COMAR") provisions, and a review of the General Assembly's intent in enacting the statute as evidenced by the legislative history, we hold that the approval requirements stated in PU § 7-304 are applicable to all energy allocation systems in apartment houses, regardless of the construction date of the building. Under the PSC's interpretation of the definition set forth in PU § 7-304, energy allocation systems are systems that determine the approximate energy use consumed in an individual dwelling unit with a device that measures a furnace operating or running time, baseboard pipe temperature, or other characteristics. *See* PU § 7-304(a)(4); COMAR 20.26.01.02. It has been a longstanding position of the PSC that the allocation of energy costs solely computed on the basis of square footage computations and pro rata assessments is governed by lease agreements under the Real Property Article and are not within the purview of the PSC.

3

Therefore, the allocation of energy costs solely computed on the basis of square footage computations and pro rata assessments, as well as added rental components, are exempt from the approval requirements set forth in PU § 7-304.

## BACKGROUND

The Maryland Uniform Certification of Questions of Law Act,[2] Md. Code (1996, 2020 Repl. Vol.), Courts & Judicial Proceedings ("CJ") §§ 12-601 *et seq.*, empowers this Court to certify questions of law to another court and answer questions of law presented to it. As such, this Court may "answer a question of law certified to it by a court of the United States or by an appellate court of another state or of a tribe, if the answer may be determinative of an issue in pending litigation in the certifying court and there is no controlling appellate decision, constitutional provision, or statute of this State." CJ § 12-603. When answering a certified question of law, this Court is statutorily prescribed to resolve questions of Maryland law; it may not determine questions of fact. *Fangman v. Genuine Title, LLC*, 447 Md. 681, 690–91 (2016) (quoting *Parler & Wobber v. Miles & Stockbridge*, 359 Md. 671, 681 (2000)).

The following information is presented from the federal district court's Certification Order.[3] Appellant Paul Moore ("Mr. Moore") is a residential apartment tenant of the

---

[2] A detailed summary of the legislative history for Maryland's Uniform Certification of Questions of Law Act is provided in *United Bank v. Buckingham*, 472 Md. 407, 411 n.1 (2021).

[3] This Court accepts the statement of facts submitted to it by the certifying court and will not "evaluate or weigh the evidence[.]" *Reed v. Campagnolo*, 332 Md. 226, 228 (1993) (quoting *Food Fair Stores v. Joy*, 283 Md. 205, 219 n.7 (1978)).

Seneca Bay Apartment Homes complex ("Seneca Bay"), built in 1968, and located in Middle River, Maryland. Appellee RealPage Utility Management, Inc. ("RealPage") manages Seneca Bay's allocated utility charges. RealPage allocates the energy charges using equipment and procedures that measure the total energy consumption by a multiple residential unit building, measure the square footage of each individual residential unit, and then assess the charges based upon the square footage computation and pro rata assessment per each individual residential unit. RealPage billed Mr. Moore for "allocated water service," "allocated sewer service," and "gas hot water service."

Mr. Moore filed a putative class action lawsuit against RealPage in the Circuit Court for Montgomery County on February 26, 2020, seeking damages, declaratory and injunctive relief for violations of the Maryland Consumer Debt Collection Act and the Maryland Consumer Protection Act, as well as various common law claims. In his complaint, Mr. Moore alleges that

> [ ] RealPage billed . . . for unlawful allocated energy charges. These energy charges were allocated by RealPage for the landlords . . . using procedures and equipment which measured and read the total energy costs consumed by multiple residential units, measured the square footage of each of the residential units, and then assessed charges for energy to the tenants residing in each of the residential units based upon the square footage of the residential units.[4]
>
> [ ] However, the Maryland Public Service Commission has not approved the energy allocation procedures and equipment utilized to allocate the energy charges[.]

---

[4] The federal district court's Certification Order and the pleadings in this matter do not provide additional details regarding the type of equipment RealPage utilizes at Seneca Bay to allocate energy charges.

5

[ ] The energy allocation procedures are, therefore, unlawful. *See* Md. Code Ann., Pub. Util § 7-304 . . . .

RealPage removed the case to the federal district court on April 8, 2020. The federal district court subsequently certified the following question of law to this Court to determine the appropriate interpretation of PU § 7-304:

> Does Md. Code Ann., Public Util. ("PU") § 7-304 prohibit the use of energy allocation equipment and procedures, which have not been approved by the Public Service Commission, to bill energy charges to tenants of properties built prior to 1978?

For the reasons that follow, we answer the federal district court's certified question of law in the affirmative. PU § 7-304 prohibits the use of energy allocation equipment and procedures that the PSC has not approved to bill energy charges to tenants of properties built prior to 1978. However, the allocation of energy costs solely computed on the basis of square footage computations and pro rata assessments have never been within the jurisdiction of the PSC. Therefore, such allocations are set forth in the requirements of written leases under Md. Code (2014, 2015 Repl. Vol.), Real Property Article ("RP") § 8-208(c)(2) and are not governed by the approval requirements set forth in PU § 7-304. However, the question of whether RealPage's system is an energy allocation system subject to the PSC's purview is not before us, the issue has not been briefed, and given the information provided to this Court by the federal district court, it is unclear what type of equipment RealPage's system utilizes. As such, in this instance, we are unable to determine whether RealPage's system is an energy allocation system subject to the PSC's purview.

6

# DISCUSSION

## A.     *The Parties' Contentions.*

Mr. Moore contends that PU § 7-304 governs the use of an energy allocation system regardless of the date of construction of the building in which that system is used.  It is Mr. Moore's position that PU § 7-304 is unambiguous, and the plain text of the statute does not contain language stating a date-of-construction limitation.  Additionally, Mr. Moore asserts that the legislative history of PU § 7-304 demonstrates that the statute was intended to apply to properties constructed prior to 1978.     Mr. Moore also emphasizes that the plain text of PU § 7-301 does not contain language expressing a date-of-construction limitation applicable to PU § 7-304.  Finally, Mr. Moore maintains that the Court of Special Appeals' holding in *Legg v. Castruccio*—a case relied upon by RealPage—did not analyze or interpret PU § 7-304 or its predecessor, and, therefore, it should not influence this Court's statutory interpretation.  100 Md. App. 748 (1994).

RealPage counters that PU § 7-304 is one part of a comprehensive statutory scheme regarding the PSC's regulation of energy measurement equipment, and, therefore, must be interpreted harmoniously with PU §§ 7-301 *et seq*.   RealPage highlights that master-metered buildings constructed prior to 1978 utilize the methods of allocating a resident's utility bill based solely on the square footage of the apartment or as a fixed charge included in the resident's rent.  Accordingly, RealPage asserts that the energy allocation systems governed by PU § 7-304 are used alternatively to individually installed meters and do not encompass the methods of allocation solely computed on the basis of square footage computations and pro rata assessments that pre-1978 buildings with master meters utilize.

7

In RealPage's view, this statutory scheme demonstrates that PU § 7-304 plainly applies only to apartment buildings constructed after 1978 and thus not to Seneca Bay, which was built in 1968. In support of its position, RealPage relies upon the Court of Special Appeals' holding in *Legg* that, under the predecessor statute to PU § 7-301, buildings constructed prior to 1978 were not subject to the individual meter requirement. 100 Md. App. at 775. As such, RealPage asserts that PU § 7-304 must be construed to contain the same date-of-construction limitation stated in PU § 7-301.

## B.    *Plain Language Analysis.*

We begin our analysis with the plain language of PU § 7-304. This Court's "chief objective is to ascertain the General Assembly's purpose and intent when it enacted the statute." *Berry v. Queen*, 469 Md. 674, 687 (2020) (citing *Neal v. Balt. City Bd. of Sch. Comm'rs*, 467 Md. 399, 415 (2020)). It is well settled that

> this Court provides judicial deference to the policy decisions enacted into law by the General Assembly. We assume that the legislature's intent is expressed in the statutory language and thus our statutory interpretation focuses primarily on the language of the statute to determine the purpose and intent of the General Assembly. We begin our analysis by first looking to the normal, plain meaning of the language of the statute, reading the statute as a whole to ensure that no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless or nugatory.

*Id.* (citing *Brown v. State*, 454 Md. 546, 550–51 (2017)).

We "will give effect to the statute as it is written" so long as "the words of the statute, construed according to their common and everyday meaning, are clear and unambiguous and express a plain meaning[.]" *United Bank v. Buckingham*, 472 Md. 407, 423 (2021) (quoting *Fangman v. Genuine Title, LLC*, 447 Md. 681, 691 (2016)). Further,

8

"statutory construction is approached from a 'commonsensical' perspective. Thus, we seek to avoid constructions that are illogical, unreasonable, or inconsistent with common sense." *Id.* at 423–24 (quoting *Della Ratta v. Dyas*, 414 Md. 556, 567 (2010)).

Applying these principles, we turn to the relevant statutory language, which states:

(1) Approval from the [PSC] is required before energy allocation equipment and procedures may be used by the owner, operator, or manager of an apartment house to determine the amount of gas or electricity used by an individual dwelling unit, if the amount of gas or electricity is determined by means other than by actual measurement of fuel or electric power consumed by the unit.

(2) An energy allocation system may not be used for direct billing of energy costs to the tenant of an individual dwelling unit unless the [PSC] approves the system in accordance with this subsection.

PU § 7-304(b)(1)–(2).

Simply, under PU § 7-304(b), if the amount of gas or electricity is determined by an energy allocation system other than by the actual measurement of fuel or electric power consumed by the individual apartment unit, the system of allocation is subject to the approval of the PSC. The plain language of PU § 7-304 does not contain a date-of-construction limitation.

We also note that "the plain language of the statute must be viewed within the context of the statutory scheme to which it belongs, considering the purpose, aim or policy of the Legislature in enacting the statute." *State v. Johnson*, 415 Md. 413, 421 (2010). The Court presumes "that the Legislature intends its enactments to operate together as a consistent and harmonious body of law," and, therefore, attempts "to reconcile and harmonize the parts of a statute, to the extent possible consistent with the statute's object

9

and scope." *Id*. at 421–22. As such, "it may be beneficial to analyze the statute's relationship to earlier and subsequent legislation, and other material that fairly bears on the fundamental issue of legislative purpose or goal, which becomes the context within which we read the particular language before us in a given case." *Berry*, 469 Md. at 687 (quoting *Blackstone v. Sharma*, 461 Md. 87, 114 (2018)).

In addition to examining the plain language of PU § 7-304(b), it is crucial to our analysis to review the relevant COMAR provisions regarding the PSC's approval of energy allocation systems. The PSC is authorized to "adopt reasonable regulations as necessary to carry out any law that relates to the [PSC.]" PU § 2-121. Additionally, PU § 7-304 specifically directs the PSC to "adopt regulations that specify the conditions under which the energy allocation equipment and procedures approved by it under subsection (b) of this section may be implemented." PU § 7-304(c)(1). This Court gives deference to the PSC's interpretation of PU § 7-304 set forth in the related COMAR provisions. *See Opert v. Criminal Injuries Comp. Bd.*, 403 Md. 587, 594 (2008) ("[T]he [C]ourt generally gives considerable weight to the agency's view."); *Montgomery Cty. v. Glenmont Hills*, 402 Md. 250, 271 (2007); *John A. v. Bd. of Educ.*, 400 Md. 363, 382 (2007). The PSC adopted regulations for implementing PU § 7-304 on April 19, 1989, which are codified in Subtitle 26 of Title 20 of COMAR. *See* 16 Md. Reg. 995 (May 5, 1989). Notably, these regulations also do not contain a date-of-construction limitation.

COMAR 20.26.01.02 sets forth the definitions for Subtitle 26. Within this subtitle, an "energy allocation system" is defined as "a method of determining the approximate energy use consumed within a dwelling unit with the use of a measuring device."

10

COMAR 20.26.01.02(B)(6). This definition of an energy allocation system is markedly similar to the statutory definition set forth in PU § 7-304, which states that an energy allocation system "means a method of determining the approximate energy use within an individual dwelling unit by a measuring device that the [PSC] approves." PU § 7-304(a)(4). Additionally, "energy allocation equipment" is defined as "a measuring device or other equipment used to determine approximate energy use by a means other than the actual measurement of consumption of gas or electricity." COMAR 20.26.01.02(B)(5). This provision also includes a definition for a "measuring device." A "measuring device" is "a device which measures furnace operating or running time, baseboard pipe temperature or other characteristics used to determine approximate energy use." COMAR 20.26.01.02(B)(9).

The PSC also established regulations regarding substitute billing. *See* COMAR 20.26.02.04. A property owner utilizing an approved energy allocation system may only engage in substitute billing if the energy allocation system has been tampered with or is out of order. COMAR 20.26.02.04(A). The substitute bill must be "based on consumption for a similar billing period in the affected unit . . . or if not available . . . an average of the bills rendered to all similarly sized units in the apartment house." COMAR 20.26.02.04(C). However, "[i]f none of [this] data is available then the substitute bill shall be based upon a square footage allocation." *Id*.

Reviewing these definitions, it is evident that an energy allocation system and energy allocation equipment revolve around the use of a device that either measures furnace operating or running time or baseboard pipe temperature or other characteristics,

11

to measure the approximate energy use.  Further, the PSC makes a distinction between the use of energy allocation systems and calculating a substitute bill on a square footage allocation.  However, it is still unclear whether the allocation of energy costs solely computed on the basis of square footage computations and pro rata assessments, as well as added rental components, was intended to be captured within the term "energy allocation system."  While the plain language of PU § 7-304 and the related COMAR provisions do not provide a definitive answer to this inquiry, the legislative history demonstrates that these methods of appropriating energy costs were not intended to be under the purview of the PSC.

## C.    *Legislative History.*

It is "the modern tendency of this Court to continue the analysis of the statute beyond the plain meaning" of the statutory language.  *In re: S.K.*, 466 Md. 31, 50 (2019).  An examination of the legislative history helps confirm that our plain language interpretation of the statute is consistent with the legislature's intent.  *Id*.  In doing so, the Court may examine "the context of a statute, the overall statutory scheme, and archival legislative history of relevant enactments."  *Id*. (quoting *Brown*, 454 Md. at 551).

The introduction of the novel technology of energy allocation systems in the mid-1980s created a classic confrontation with disgruntled constituents who urged legislative action.  Senator Barbara A. Hoffman and Senator Paula Colodny Hollinger sponsored legislation to address the issues presented by these unregulated energy allocation systems in both the 1987 and 1988 Legislative Sessions.  Our review of the legislative history will encompass the 1977 legislation requiring individual meters for newly

12

constructed residential multiple occupancy buildings, as well as the first attempt to regulate

energy allocation systems with proposed legislation under the Real Property Article in the

1987 Legislative Session, and the successful attempt at regulation in the 1988 Legislative

Session following the completion of a summer study.

1. *Requiring Individual Meters for Newly Constructed Apartment Buildings: House Bill 1493, 1977 Legislative Session.*

During the 1977 Legislative Session, Delegate Steven Sklar sponsored House Bill

1493 ("HB 1493"), which proposed an individual meter requirement for newly constructed

residential apartment buildings. Proponents of the legislation identified that individual

meters provide benefits of energy conservation and energy efficiency during a time when

the nation was experiencing an energy crisis.[5] *See* Letter of John P. Hewitt, Director of the

Energy Policy Office, to John S. Arnick, Chairman of the House Environmental Matters

Committee in legislative bill file for House Bill 1493 (1977).

In light of the energy conservation goals, the General Assembly enacted

Article 78, § 51(b)

---

[5] Members of the Organization of Arab Petroleum Exporting Countries declared an embargo on oil shipments to the United States and reduced their petroleum production, sparking an energy crisis, as a result of the United States' effort to resupply Israel following the start of the Yom Kippur War in October 1973. The effects of this energy crisis were felt throughout the nation, including in Maryland. Sharp increases in fuel costs and a surge in the nation's inflation rate began in late-1973. *See* Art Pine, *Energy Crisis Fuel Prices Surge*, Balt. Sun, Dec. 7, 1973, at A1. By the beginning of 1974, the energy crisis and fuel shortages were the top concern of the American people. *See* George Gallup, *Energy Crisis is No. 1 Concern*, Balt. Sun, Jan. 31, 1974, at A8. President James Earl Carter, Jr., encouraged the nation to engage in energy conservation efforts as way to navigate through the energy crisis. *See* Peter Behr, *Carter Says Nation Must Shift to Coal in Citing 'Brutal Facts' of Energy Crisis*, Balt. Sun, March 18, 1977, at A1.

13

> [for] the purpose of prohibiting the Public Service Commission from authorizing a gas company, an electric company, or a gas and electric company to service any new residential multiple occupancy building on which construction begins after a certain date unless that building has an individual meter for each occupancy unit that is individually leased or owned[.]

1977 Md. Laws, ch. 561. In pertinent part for the effective date, Article 78, § 51(b) provided as follows:

> The Public Service Commission may not authorize a gas company; an electric company, or a gas and electric company to service any new residential multiple occupancy building on which construction begins after July 1, 1978 unless that building has an individual meter for each occupancy unit that is individually leased or owned.

Thus, Article 78, § 51(b) specified a clear demarcation line that any residential multiple occupancy building constructed after July 1, 1978, must have an individual meter for each occupancy unit to determine a tenant's utility charges. Accordingly, this statute required the installation of individual meters for buildings constructed after July 1, 1978. Residential multiple occupancy buildings constructed before July 1, 1978 were not affected by this legislation.

The Court of Special Appeals further clarified this demarcation line when it interpreted Article 78, § 51(b) in a dispute between a landlord and a tenant regarding the installation of separate meters for individual apartments. *Legg*, 100 Md. App. at 773–75. Deborah Legg resided as a tenant on the ground floor of a two-story house owned by Sadie and Peter Castruccio ("Castruccios"). *Id*. at 754. Ms. Legg moved into the house while the second floor remained unoccupied and reached an agreement with the Castruccios that the utility account for the house—which had only one meter—would be in Ms. Legg's

14

name.  *Id*.  Eventually tenants moved into the second story of the house and reached a verbal agreement with Ms. Legg that the upstairs tenants would pay one-half of the utility bill.  *Id*.

The upstairs tenants subsequently ceased paying their agreed share of the bill and Ms. Legg requested that the Castruccios install separate meters for the two apartments.  *Id*. at 755–56.  The Castruccios did not install a second meter for the upstairs apartment, and the upstairs tenants eventually moved out without paying their share of the outstanding utility bills.  *Id*. at 756.  The Castruccios also refused to pay any portion of the utility bills and sought to repossess the property from Ms. Legg.  *Id*.

Ms. Legg filed a counterclaim alleging that the Castruccios "engaged in unfair or deceptive trade practices in the rental and offer of rental of consumer realty[.]"  *Id*. at 752.  In support of this claim, Ms. Legg argued that "the Castruccios violated a Maryland Public Policy 'that all residents should have access to utility services and that the only condition that can be imposed upon the service is that a person must pay her [or his] own bill.'"  *Id*. at 773.

While Ms. Legg did not rely upon Article 78, § 51(b) in her contention, the intermediate appellate court raised the statute in its analysis as "an important Code section" that addresses "the regulation of gas and electric service companies by the [PSC]."  *Id*. at 773–74.  In emphasizing that Article 78, § 51 "is not limited to an 'apartment house'" the Court of Special Appeals expressed that "Section 51(b) . . . does not, however, apply to buildings constructed before 1978, presumably because the General Assembly did not want to place the burden of retroactive application on landlords and owners."  *Id*. at 775.

15

The intermediate appellate court's analysis emphasizes that the General Assembly was cautious in not encumbering landlords and property owners with the task of retrofitting all residential multiple occupancy buildings with individual meters. Instead, the legislature provided a clear delineation for residential multiple occupancy buildings constructed after a specific date, July 1, 1978, and the requirement to use individual metering or submetering.

Following Maryland's code revision,[6] PU § 7-301 set forth the requirements for the use of individual meters that were previously stated in Article 78, § 51. 1998 Md. Laws, ch. 8. In pertinent part, PU § 7-301(c) provides:

(1) This subsection applies to:

    (i) a new residential multiple occupancy building;

    (ii) a new shopping center; or

    (iii) a new housing unit that is constructed, managed, operated, developed, or subsidized by a local housing authority established under Division II of the Housing and Community Development Article.

(2) The service restrictions imposed under this subsection do not apply to central hot water.

---

[6] "As we have noted in the past, code revision is a periodic process by which statutory law is re-organized and restated with the goal of making it more accessible and understandable to those who must abide by it." *United Bank*, 472 Md. at 427 n.6 (quoting *Nationwide Mut. Ins. Co. v. Shilling*, 468 Md. 239, 251 n.9 (2020)). "Maryland Code Revision began in 1970 as a long-term project to create a modern comprehensive code when Governor Marvin Mandel appointed the Commission to Revise the Annotated Code. This formal revision of the statutory law for the General Assembly was coordinated by the Department of Legislative Services. Code Revision was completed in 2016 with the enactment by the General Assembly of the Alcoholic Beverages Article." *Id.* (quoting *Nationwide Mut. Ins. Co.*, 468 Md. at 251 n.9).

(3) The [PSC] may not authorize a gas company or electric company to service an occupancy unit or shopping center unit subject to this subsection unless the building or shopping center has individual metered service or submetering as provided under § 7-303 or § 7-304 of this subtitle for each individually leased or owned occupancy unit or shopping center unit.

(4) In accordance with its regulations, the [PSC] may authorize a gas company or electric company to provide service for central heating or cooling systems, or a combination of those systems, to an occupancy unit or shopping center unit subject to this subsection if the [PSC] is satisfied that the service will result in a substantial net saving of energy over the energy saving that would result from individual metering or submetering as provided under § 7-303 or § 7-304 of this subtitle.

PU § 7-301(c)(1)–(4).[7]

The Revisor's Note[8] to PU § 7-301 states that "[t]his section is new language derived without substantive change from former Art[icle] 78, § 51(b)," and that "the former

---

[7] RealPage additionally argues that the cross-references contained within PU § 7-301(c) to PU § 7-304 indicate that the date-of-construction limitation from PU § 7-301 should be read into PU § 7-304. However, this cross-reference did not appear until the recodification of PU § 7-301. Prior to code revision, the only cross-reference in Article 78, § 51(b) was to Article 78, § 54G, the predecessor to PU § 7-303, even though the predecessor to PU § 7-304, Article 78, § 54H, already existed.

We understand that code revision takes place "for the purpose of clarity only and not substantive change, unless the language of the recodified statute unmistakably indicates the intention of the Legislature to modify the law." *DeBusk v. Johns Hopkins Hosp.*, 342 Md. 432, 444 (1996). The Revisor's Note to PU § 7-301 clearly states that the "section is new language derived without substantive change from former Art[icle] 78, § 51(b)[.]" Therefore, the cross-reference to PU § 7-304 does not alter the substantive meaning of the statute.

Further, PU § 7-301(c) notably refers to "individual metered service or submetering as provided under § 7-303 or § 7-304." PU § 7-303 sets forth the requirements for submetering. However, PU § 7-304 does not relate to either individual metering or submetering. Accordingly, the cross-reference appears inapposite and accidental.

[8] A Revisor's Note is an "extrinsic aid intended to help the reader use and interpret a revised statute." Kathleen M. Boucher, et al., Department of Legislative Services Revisor's

17

references to construction 'after July 1, 1978' and 'after July 1, 1985' are deleted as obsolete." Therefore, this recodification does not alter the original legislative intent of the predecessor statute enacted in 1977. While PU § 7-301(c) limits the applicability of the subsection to "new residential multiple occupancy building[s]," "new shopping center[s]," and "new housing unit[s,]" the line of demarcation regarding the use of individual meters in residential multiple occupancy buildings remains. In other words, the removal of the date of July 1, 1978, during code revision does not change the original legislative intent of this statute not to require retrofitting of master meters that existed in pre-1978 buildings.

2. *Novel Technology for Computing Energy Allocation Charges in Mid-1980s and the Public Service Commission's Response to the New Energy Allocation Technology.*

New systems of calculating a charge to tenants for monthly gas and electricity bills were introduced during the mid-1980s throughout the state. Constituent complaints were made to Senator Hoffman and Senator Hollinger about the Compugas System ("Compugas") that was installed in seven apartment complexes throughout Baltimore City and Baltimore County, impacting approximately 2,500 tenants. In addition to Compugas, similar systems were implemented in apartment buildings in other counties across the state,

---

Manual 19 (5th ed. 2000). While "Revisor's Notes are not part of the law," the notes "serve an important function in preserving the intent and substance of the current law." *Id.* This Court has consistently reiterated the importance of reviewing the Revisor's Notes "in ascertaining legislative intent." *Id.* (citing *Off. & Pro. Emps. Int'l Union v. Mass Transit Admin.*, 295 Md. 88, 101 (1982)).

such as FareShare[9] and AccuMeter.[10]  Senator Hoffman contacted state agencies regarding

this novel technology in response to the constituent complaints that she began to receive in

1985.  *See* Senate Bill 899 (1987); partial transcript of hearing before House Committee

on Economic Matters (Apr. 2, 1987) in legislative bill file for Senate Bill 899 (1987).

Many of the concerns received were from elderly tenants living on a fixed income

and accustomed to their rental charge for the month including the cost of their utilities,

both gas and electric, as an added rental component.  *Id*.  The constituents' complaints

expressed concerns regarding the accuracy of their gas and electricity bills because there

was no meter that could be checked, and questioned whether a system like Compugas

constituted a fair and accurate measurement of their actual energy use.  *Id*.  As a result of

Senator Hoffman's contacts, a dispute arose between the PSC and the Weights and

Measures Bureau of the Department of Agriculture as to which agency had the authority

to regulate this novel technology.  Shirley L. Bigley, assistant general counsel for the PSC,

stated to the Baltimore Sun that "the PSC recommends that regulation of the gas-allocation

devices be left up to the Weights and Measures Bureau of the Department of Agriculture

---

[9] FareShare was used "to measure and allocate energy usage in apartment buildings, office buildings, commercial complexes and condominiums."  *See* Michigan Public Service Commission, *In re Energy Metering Control Corp.*, Case No. U-8122, at 3 (Apr. 8, 1986). In 1986, FareShare was employed by landlords in sixteen states to "apportion[] actual energy consumption for heating domestic hot water and for heating and cooling in hydronic, fan coil, steam and gas forced air systems."  *Id.*

[10] *See* Letter of Barbara L. Ruland, Baltimore Neighborhoods, Inc. Field Staff, to the Members of the Senate Finance Committee in legislative bill file for Senate Bill 378 (1988).

and that other disputes be mediated through the landlord-tenant laws." Phillip Davis, *New System of Billing for Heat Irks Tenants*, Balt. Sun, Mar. 18, 1987 at 3B.

In response to a letter from the Department of Agriculture, the PSC argued that it only had jurisdiction over systems and equipment measuring the actual consumption of gas and electricity.[11] In a December 30, 1986 letter ("1986 PSC Letter") Frank Heintz, Chairman of the PSC, to the Honorable Wayne A. Cawley, Jr., Secretary of the Department of Agriculture, explained why the PSC believed it did not have regulatory responsibility over Compugas and systems like it. *See* Letter from Frank Heintz, Public Service Commission Chairman, to the Honorable Wayne A. Cawley, Jr., Department of Agriculture Secretary in legislative bill file for Senate Bill 899 (1987). The 1986 PSC Letter cited Compugas, sold by GRH Electronics of Omaha, Nebraska, and attached this description:

> Compugas is a self-contained microcomputer designed expressly for natural gas allocation in master-metered apartment buildings. It is intended for use in new or existing properties where the installation of individual gas meters is either economically or physically impractical.
>
> In order to collect usage data, Compugas is wired to each furnace in an apartment complex and keeps track, on a month-to-month basis, of how many minutes each apartment furnace runs. At the end of each month, this "runtime" information is transferred, via solid-state recording "module", to a central computer facility.
>
> Based on the size of the furnace and the runtime, each apartment's "heat bill" is computed. Then all the "heat bills" for a building are totaled, and the sum is subtracted from the amount of the total utility company bill for that building. This difference is the "common usage." The "common usage" is

---

[11] The letter from the Department of Agriculture to the PSC is not part of the legislative record, but the PSC's responsive letter is.

then divided on a percentage basis among the apartments. If all the apartments are the same size, each apartment is charged exactly the same percent of the "common usage" total. Otherwise, the "common usage" charge is factored by the proportional relationship of the apartment sizes. Then each apartment's allocation of the common usage is added to its measured heat usage and the bill is prepared.

*Id.*

As indicated in its description, Compugas did not calculate the actual use of a tenant's gas and electricity consumption. Rather, the system relied on a different component of measurement—i.e., the size of the furnace and the furnace runtime—to compute a tenant's energy usage. Compugas utilized the square footage of a tenant's apartment in determining what percentage of the "common usage" measurement should be allocated to a tenant's utility bill. As such, a tenant's primary utility bill was calculated based on the size of the furnace and the furnace runtime. The size of a tenant's apartment was only utilized in computing their allocated share of the "common usage" charge. Because Compugas did not calculate the actual use of a tenant's gas and electricity consumption, its system did not fall within the PSC's definition of a submeter and was not within the PSC's purview. As a result, wholly unregulated energy allocation systems were being used by landlords throughout the state. In his explanation, Chairman Heintz set forth "three basic categories of measuring systems: metered service; submetering; and, other measuring systems[,]" which are described in detail below. *Id.*

### i. *Metered Service.*

The 1986 PSC Letter stated that "metered service refers to a utility's measurement of electric or gas service." *Id.* Additionally, the letter added that a "utility's meters are

21

used to measure the consumption of electricity or gas" and these "measurements determine the amount of charges which the utility will impose upon the customer." *Id*. The 1986 PSC Letter indicated that "metered service" identifies a system that measures the actual use of electricity or gas.

### ii. Submetering.

Submetering, according to the 1986 PSC Letter, "refers to equipment which measures the actual use of gas or electricity for the purpose of allocating the cost of each rental unit's gas or electrical consumption at an apartment house, office building or shopping center." *Id*. The letter distinguished that "[t]his equipment is not installed or owned by a utility, but is installed and operated under the direction of the landlord." *Id*. Further, the PSC "has jurisdiction to establish regulations governing the installation and accuracy of submetering equipment[,]" but the PSC does not have jurisdiction over "complaints by an occupant of a rental unit about submetering." *Id*. These matters are "subject to the jurisdiction of a landlord-tenant commission, a consumer protection agency, or other agency designated for tenants' complaints." *Id*.

The definition of submetering in the 1986 PSC Letter is consistent with the current definition of "submetering" found in COMAR 20.25.01.01, which also mirrors the definition of "submetering" in PU § 7-303(a)(7). COMAR 20.25.01.01(F)(13) defines "submetering" as "the installation of equipment for the purpose of determining the actual use of electricity or gas per residential unit or commercial rental unit." Both of these definitions of submetering identify equipment that measures the actual use of electricity or gas.

22

*iii. Other Measuring Systems.*

The 1986 PSC Letter outlined the third category of "other measuring devices," broadly including "any and all varieties of methods for allocating gas or electric costs which do not fall within the specific definitions of 'metered service' or 'submetering.'" *See* 1986 PSC Letter.

The issue raised by Compugas, as characterized in the 1986 PSC Letter, was whether that system constituted submetering within the PSC's definition or whether that system fell within the broad category of an "other measuring device." *Id*. The 1986 PSC Letter emphasized that "measuring devices or allocation systems which measure the operation or output of gas or electric appliances as a surrogate for measuring the actual cubic feet of gas or actual kilowattage of electricity are not subject to the jurisdiction of the [PSC]." *Id*. The 1986 PSC Letter reiterated that the PSC "has jurisdiction only over devices actually measuring the cubic feet of gas or kilowatt[-]hours of electricity, and not systems which attempt to indirectly approximate the consumption of gas or electricity." Thus, the letter stated that the Compugas system was not within the PSC's regulatory responsibility as "this type of system does not measure the actual use of gas or electricity[.]" *Id*.

In addition to explaining why Compugas was not within the PSC's jurisdiction, the 1986 PSC Letter also explained that the allocation of utility charges solely computed on the basis of square footage computations and pro rata assessments, as well as added rental components, "are established in the lease agreements between the landlord and the tenant." *Id*. Accordingly, "the [PSC] has never had jurisdiction over such landlord/tenant contract

23

provisions[.]" *Id.* In making this distinction, the PSC defined energy allocation systems as systems that do not measure the actual use of a tenant's gas or electric consumption, while excluding the allocation of utility charges solely computed on the basis of square footage computations and pro rata assessments and added rental components from this description.

The PSC's viewpoint set forth in the 1986 PSC Letter—that the allocation of utility charges solely computed on the basis of square footage computations and pro rata assessments are governed by lease agreements between the landlord and the tenant—is reflected in statutory provisions contained in the Real Property Article. Specifically, RP § 8-203.1 previously read:

> (a) After January 1, 1975, any landlord who offers more than 4 dwelling units for rent on one parcel of property or at one location and who rents by means of written leases, shall:
>
> ***
>
> (2) Embody in the form of lease and in any executed lease the following:
>
> ***
>
> (ii) The landlord's and the tenant's specific obligations as to heat, gas, electricity, water, and repair of the premises.

1999 Md. Laws, ch. 649.

In 1998, Governor Parris Glendening established by Executive Order the Commission to Review Landlord-Tenant Laws ("Commission") to improve the equity, efficiency, and effectiveness of landlord-tenant laws. *See* Bill Analysis from House Committee on Economic Matters in legislative bill file for House Bill 605 (1999). As a

part of its final report, the Commission recommended to merge RP § 8-203.1 into RP § 8-208 "so that the required contents of a lease would be located in one place." *See* Report of the Commission to Review Landlord-Tenant Laws, at 3 (Dec. 15, 1998). Therefore, RP § 8-208(c)(2) provided that "[a] lease shall include . . . [t]he landlord's and the tenant's specific obligation as to heat, gas, electricity, water, and repair of the premises." 1999 Md. Laws, ch. 649. RP § 8-208(c)(2) has remained unchanged since it took effect on October 1, 1999.

### 3. First Attempt to Regulate Novel Technology Through the Real Property Article: Senate Bill 899, 1987 Legislative Session.

During the 1987 Legislative Session, Senator Hoffman voiced the concerns of her constituents regarding the implementation of Compugas in their various apartment complexes and the issue of who had regulatory responsibility over these types of systems. *See* Senate Bill 899 (1987); partial transcript of hearing before House Committee on Economic Matters (Apr. 2, 1987) in legislative bill file for Senate Bill 899 (1987). Senator Hoffman testified before the House Committee on Economic Matters on April 2, 1987 in support of Senate Bill 899 ("SB 899"), which was drafted to address the issues presented by Compugas.

Senator Hoffman explained in her testimony that she disagreed with the PSC's perspective, and "felt that [the regulatory responsibility] clearly belonged under the Public Service Commission[.]" *Id.* Originally, SB 899 read, "[e]quipment or devices that do not determine the actual use of gas or electricity per residential or commercial unit shall be subject to approval by the Public Service Commission." *Id.* Notably, the original drafting

of SB 899 placed the regulatory oversight of energy allocation systems with the PSC. However, when SB 899 was heard by the Senate Finance Committee, a representative of the PSC testified that while the PSC agreed that the area needed to be regulated, their belief was that the oversight belonged to the Weights and Measures Bureau of the Department of Agriculture or within landlord-tenant law. *Id*. In response, the Senate Finance Committee amended SB 899 to place the issue in the Real Property Article due to the PSC's position on its lack of jurisdiction over energy allocation systems. The amended bill passed the Senate and was heard by the House Committee on Economic Matters. *Id*.

The bill analysis of SB 899 before the House Committee on Economic Matters summarized the bill as requiring

> that the rental lease agreement must contain a complete description of the energy allocation system used if recoverable utility costs for tenants are not:
>
> **1) submetered,**
>
> **2) individually metered,**
>
> **3) determined by square foot calculations, or**
>
> **4) added rental compon[e]nts.**
>
> This provision applies only to residences with 10 or more residential units. The bill requires the landlord to keep and make available to tenants adequate records of all energy allocation systems and procedures used.

*See* Bill Analysis from House Committee on Economic Matters in legislative bill file for Senate Bill 899 (1987) (emphasis added).

As amended, SB 899 proposed to add language to the Real Property Article that would help tenants understand exactly how their utility costs were being calculated if their

26

apartment complex utilized an energy allocation system that measured something other than the actual use of a tenant's gas or electric consumption. Additionally, the proposed legislation would require landlords to keep records of the specific energy allocation system and procedures being used within the complex. Senate Bill 899 explicitly carved out square footage calculations and added rental components from its definition of an energy allocation system, focusing the scope of what constitutes an energy allocation system only to those systems that attempt to indirectly approximate the consumption of gas or electricity.

When Senator Hoffman concluded her testimony before the House Committee on Economic Matters, she stated that she "still believe[d] that the public would be best served if the Public Service Commission had the authority to regulate such systems[.]" *See* Senate Bill 899 (1987); partial transcript of hearing before House Committee on Economic Matters (Apr. 2, 1987) in legislative bill file for Senate Bill 899 (1987). Consequently, SB 899 was voted unfavorably by the House Committee on Economic Matters in favor of an interim study of this issue.

4. *Summer Study Results in Regulation of Novel Technology by the Public Service Commission: Senate Bill 378, 1988 Legislative Session.*

The defeat of SB 899 in the 1987 Legislative Session was so the matter could be referred for an interim study, colloquially referred to as a "summer study." *See Trail v.*

27

*Terrapin Run, LLC*, 403 Md. 523, 569 (2008).  Accordingly, during the interim,[12] a workgroup consisting of representatives from the PSC, the Consumer Protection Division of the Office of the Attorney General of Maryland, the Weights and Measures Bureau of the Department of Agriculture, and representatives from the Baltimore Gas and Electric Company was assembled to conduct the summer study.  Upon completion of the summer study, the members of the workgroup reached a consensus as to the appropriate regulation of these energy allocation systems.  Accordingly, Senator Hoffman and Senator Hollinger sponsored a revised bill, Senate Bill 378 ("SB 378"), in the 1988 Legislative Session to address the issue of Compugas and unregulated energy allocation systems.  While no report from the workgroup's summer study was included within the respective bill files, Senator Hoffman credited the workgroup with the creation of the draft bill for SB 378.  *See* Senate Bill 378 (1988); partial transcript of hearing before Senate Finance Committee (Feb. 19, 1988) in legislative bill file for Senate Bill 378 (1988).

Senate Bill 378 no longer placed the issue of unregulated energy allocation systems within the Real Property Article.  Instead, SB 378 returned to the original language of SB 899 from the 1987 Legislative Session in establishing the regulatory responsibility of energy allocation systems with the PSC.  Senator Hoffman testified on SB 378 before the Senate Finance Committee on February 19, 1988 and before the House Committee on Constitutional and Administrative Law on March 28, 1988.  In her testimony, Senator

---

[12] The term "interim" refers to the nine months between legislative sessions.  *See* Maryland General Assembly, *Legislative Lingo*, https://mgaleg.maryland.gov/pubs-current/current-legislative-lingo.pdf [https://perma.cc/3582-REPG].

Hoffman emphasized that SB 378 solved "the problems created by having a totally unregulated energy allocation system in use." *Id.* Senator Hoffman explained that in response to her advocacy, the Governor[13] encouraged the PSC to drop its opposition and agree to this regulatory responsibility. *See* Senate Bill 378 (1988); partial transcript of hearing before House Committee on Constitutional and Administrative Law (Mar. 28, 1988) in legislative bill file for Senate Bill 378 (1988). Additionally, Senator Hoffman stated that "[t]he PSC sees their role as a [one-time] thing. After [the PSC] make[s] their ruling on a system, [the PSC] will not have to be the agency to handle complaints. That makes [the PSC] happy." *See* Senate Bill 378 (1988); partial transcript of hearing before Senate Finance Committee (Feb. 19, 1988) in legislative bill file for Senate Bill 378 (1988). Senator Hoffman further explained that "SB 378 really does solve the problem for everyone, including the owners of the energy allocation systems who will have the assurance that once their system is approved by the PSC, they will be allowed to operate." *Id.*

Senate Bill 378 received favorable votes from both the Senate and the House of Delegates adding Article 78, § 54H "[f]or the purpose of requiring the Public Service Commission to approve certain metering equipment that does not determine the actual use of gas or electricity[.]" 1988 Md. Laws, ch. 585. The General Assembly did not alter longstanding methods of allocating energy costs solely computed on the basis of square

---

[13] William Donald Schaefer was Governor of Maryland from January 21, 1987, to January 18, 1995.

29

footage computations and pro rata assessments or added rental components into this legislation addressing energy allocation systems because these methods are not within the PSC's purview.

In pertinent part, Article 78, § 54H provided as follows:

(b)(1) Energy allocation equipment and procedures that determine an individual apartment unit's gas or electricity use by means other than by actual measurement of fuel or electric power consumed by those units shall be subject to approval by the Public Service Commission.

(2) The Public Service Commission shall adopt regulations specifying the conditions under which the energy allocation equipment and procedures approved by the [PSC] under Paragraph (1) of this subsection may be implemented, including requirements for informing consumers about estimated energy costs.

(3) The Public Service Commission shall send any complaints about an individual apartment unit's gas or electric power consumption determined by use of the energy allocation equipment and procedures approved by the Commission under paragraph (1) of this subsection to the Consumer Protection Division in the Office of the Attorney General.

(4) Unless approved by the [PSC] under this subsection, an energy allocation system may not be used for the purpose of directly billing energy costs to individual apartment unit tenants.

1988 Md. Laws, ch. 585.

By enacting Article 78, § 54H the General Assembly sought to specify "that the Public Service Commission regulate certain energy allocation devices that determine energy use in ways other than by measuring the actual energy used." *See* Floor Report, Senate Bill 378, Senate Finance Committee of the Maryland Senate, 1988 Leg., 398th Sess. (Md. 1988). Article 78, § 54H did not alter the PSC's existing definition of a meter or a submeter. Instead, the statute expanded the PSC's jurisdiction to now include regulatory

30

responsibility over energy allocation systems that indirectly approximate the consumption of gas or electricity.

As previously discussed, the PSC adopted regulations pursuant to its statutory authority following the enactment of Article 78, § 54H to implement the approval requirements for energy allocation systems. Reviewing these definitional provisions, it is evident the PSC interpreted a narrow definition as to what qualifies as an energy allocation system and energy allocation equipment. These provisions identify that an energy allocation system and energy allocation equipment revolve around the use of a device that measures furnace operating or running time, or baseboard pipe temperature or other characteristics, like the method utilized by Compugas, to measure the approximate energy use. *See* COMAR 20.26.01.02. Accordingly, the definition of an energy allocation system, which does not include the allocation of energy costs solely computed on the basis of square footage computations and pro rata assessments, was the understanding of the PSC when Article 78, § 54H was enacted.

In 1998, as part of Maryland's code revision, the General Assembly repealed Article 78 in its entirety and replaced it with the Public Utility Companies Article.[14] 1998 Md. Laws, ch. 8. The stated purpose was to "add[] a new article to the Annotated Code of Maryland, to be designated and known as the 'Public Utility Companies Article,' to revise,

---

[14] In 2010, twelve years after the recodification, the General Assembly changed the name of this Public Utility Companies Article to the Public Utilities Article. 2010 Md. Laws, ch. 37.

restate, and recodify the laws of the State relating and pertaining to: the Public Service Commission[.]" *Id.*

Under the new statutory arrangement, PU § 7-304(b) set forth the approval requirements of the PSC for energy allocation equipment and procedures that determine the amount of gas or electricity of an individual dwelling unit in an apartment house by means other than by the actual measurement of gas or electricity consumed by the unit. *Id.* The Revisor's Note offers that "[t]his section is new language derived without substantive change from former Art. 78, § 54H." *Id.* Therefore, this recodification does not alter the original legislative intent of its predecessor's enactment in 1988.

The plain language of Article 78, § 54H, PU § 7-304, and the related COMAR provisions, as well as the legislative history of SB 899 and SB 378 establish that the General Assembly did not intend to place a date-of-construction limitation on the applicability of PU § 7-304. An extensive review of these materials also demonstrates that an energy allocation system refers to a subset of technology that does not include the allocation of energy costs solely computed on the basis of square footage computations and pro rata assessments and added rental components. Thirty-three years have passed since the predecessor to PU § 7-304 was enacted, with no substantive changes being made to the original statute's language. While there may be policy reasons for the PSC to regulate equipment used for square footage computations and pro rata assessments, the 1988 statute has a specific application that this Court cannot overlook. Therefore, the General Assembly would need to pass new legislation to bring such methods within the PSC's regulatory responsibility. *See In re S.K.*, 466 Md. at 57–58.

32

**CONCLUSION**

For the foregoing reasons, we answer the question certified to us by the federal district court in the affirmative and hold that the approval requirements stated in PU § 7-304 are applicable to all energy allocation systems. The statute defines such systems as "a method of determining the approximate energy use within an individual dwelling unit by a measuring device that the [PSC] approves." PU § 7-304(a)(4). Accordingly, the allocation of energy costs solely computed on the basis of square footage computations and pro rata assessments are not within the PSC's purview, and, therefore, are exempt from the approval requirements stated in PU § 7-304. Based on the information presented to this Court from the federal district court, it is unclear what type of method RealPage's system utilizes. We have not been asked, and we cannot determine, whether RealPage's system is an energy allocation system subject to the PSC's purview.

**CERTIFIED QUESTION OF LAW ANSWERED AS SET FORTH ABOVE. COSTS TO BE DIVIDED EQUALLY.**